TEXAS AUTO SUPPLY CO. v. GULF RE-
FINING CO. (No. 8836.)

(Court of Civil Appeals of Texas. Ft. Worth.
March 30, 1918. Rehearing Denied
May 4, 1918.)

SALES &164—CONTRACT—QUANTITY.

It being contemplated and intended in mak-
ing contract for defendant selling to plaintiff
during the year 35,000 gallons or such quantity
of gasoline as plaintiff might require for its
business that defendant would not be bound to
furnish exceeding approximately that amount, it,
furnishing 87,000 gallons, is not liable for refus-
ing more.

Appeal from District Court, Tarrant
County; Bruce Young, Judge.

Action by the Texas Auto Supply Com-
pany against the Gulf Refining Company.
Judgment for defendant, and plaintiff ap-
peals. Affirmed.

Wray & Mayer, of Ft. Worth, for appel-
lant. Capps, Cantey, Hanger & Short, of
Ft. Worth, and D. Edward Greer, of Hous-
ton, for appellee.

DUNKLIN, J. The Texas Auto Supply
Company instituted this suit against the
Gulf Refining Company to recover damages
for an alleged breach of its contract in
writing for the sale of gasoline to the Motor-
car Specialty Company. Plaintiff alleged
that after said contract was executed the
Motorcar Specialty Company took over the
business of the Texas Auto Supply Com-
pany, and by amendment to its charter
adopted the name of that company as its
own. In addition to pleas of general de-
nial of plaintiff's cause of action and spe-
cial defenses, defendant pleaded a counter-
claim for the value of certain gasoline sold
to plaintiff over and above that covered by
the contract. From a judgment denying
plaintiff any recovery and in favor of the
defendant on its counterclaim, plaintiff has
appealed.

The trial was without the aid of a jury,
and the trial judge filed findings of fact and
conclusions of law which are as follows:

"I find that on the 1st day of June, A. D.
1912, defendant, Gulf Refining Company, entered
into a contract with the Motorcar Specialty
Company in terms and figures as follows, to wit:

" 'This contract made and entered into this
the 1st day of June, 1912, between the Gulf
Refining Company, of Port Arthur, Tex., first
party, and Motorcar Specialty Company, of Ft.
Worth, Tex., second party, witnesseth: That
first party sells and agrees to deliver to second
party, and second party agrees to purchase and
receive from first party, during the period of
twelve months commencing June 1, 1912, 35,000
gallons or such quantity of store gasoline as sec-
ond party may require during that time for its
own consumption, at nine cents per gallon, f. o.
b. Ft. Worth, Texas.

" 'Payment. Payment shall be on the 10th of
each month for previous months' purchases, and
in case second party shall fail to pay any draft
drawn by first party for bills due, first party

may, if it so elect, cancel and terminate this
contract.

" 'First party guarantees that this store gaso-
line shall be of uniform quality, and at all times
up to regular standard.

" 'Should there be at any time during the life
of this contract a decline in the company's sched-
ule of prices at the above-named point of deliv-
ery below price named in this contract, the sec-
ond party shall have the benefit of such schedule
during the time it is in effect.

" 'Conditions. In case of fire, strike, failure of
railway, vessel, or pipe line service, as public or
private carriers, or any act of God or providen-
tial causes happening to either party on account
thereof.

" 'This contract to be signed in triplicate by
both parties hereto, and becomes effective only
when approved by the general sales manager, or
his assistant, of the first party, and when so
approved one copy will be forwarded to second
party.

" 'Witness the signatures of first and second
parties this 1st day of June, 1912. Gulf Refin-
ing Company, C. L. Kerr, Dist. Sales Manager.

" 'Attest: ——————.

" 'Approved: Motorcar Specialty Co., Inc., W.
H. Hartman, Asst. General Sales Mgr. High.'

"I further find that at the time of the exe-
cution of the above contract the Motorcar Spe-
cialty Company was a corporation having been
engaged in the business of selling automobile
accessories, tires, etc., for a short time before
June 1, 1912, but had not established a business
in the sale of gasoline.

"I further find that at the time of the exe-
cution of the contract the Motorcar Specialty
Company had installed a five-barrel tank hold-
ing approximately 270 gallons, preparatory to
engaging in the business of selling gasoline in
small quantities at retail to consumers to be
delivered from such tank, and that the contract
between the parties was made with the inten-
tion of supplying the Motorcar Specialty Com-
pany with the gasoline it might require for the
wants of its then contemplated business during
the period of time covered by the contract in
accordance with the estimate made by the said
parties as to the probable requirements.

"I further find that at the time of the exe-
cution of the contract there was an estimate
made between the parties thereto as to the
probable requirements of the Motorcar Special-
ty Company for gasoline during the period of
time covered by the contract, and that it was
then estimated that 100 gallons a day, or 35,-
000 gallons for the year, would be the maxi-
mum or a quantity approximating the maxi-
mum that the Motorcar Specialty Company
would require.

"I further find that in naming 35,000 gal-
lons in the contract it was the intention of the
parties thereto to state the maximum amount
or the quantity approximating the maximum
amount of gasoline which the Motorcar Special-
ty Company would require during the period of
12 months commencing June 1, 1912.

"I further find that it was the further inten-
tion of the parties in executing the contract to
state in the agreement that the Motorcar Spe-
cialty Company would purchase from the Gulf
Refining Company during the period of 12
months commencing June 1, 1912, only such quan-
tity of gasoline that the Motorcar Specialty
Company might require during that time for its
own consumption, and that the term 'consump-
tion' was intended to mean the resale of gaso-
line in quantities at retail to individual own-
ers of automobiles delivered to the customers of
the Motorcar Specialty Company in the usual
manner from its tank.

"I further find that the quantity of gasoline
which the Motorcar Specialty Company may
have required for its own consumption during

&For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

the period of 12 months commencing June 1, 1912, as those terms were used and intended to be understood in the contract, was dependent upon the future conduct of its business, and upon the continuance or discontinuance, the enlargement or curtailment of its business, the fluctuations in the market prices of gasoline, the demand of the public and other uncertain contingencies, and that it was not the intention of the parties to the contract, and they did not contract, to obligate the Motorcar Specialty Company to purchase and receive from the Gulf Refining Company any fixed or ascertainable quantity of gasoline, or to continue the resale of gasoline for any fixed duration of time.

"I find that in October, 1912, the Texas Auto Company was a partnership firm composed of James Harrison and Homer Lyne, engaged in the business of buying and reselling gasoline in the city of Ft. Worth, Tarrant county, Tex., in competition with the Motorcar Specialty Company, and about said time purchased the stock and business of the Motorcar Specialty Company, and on November 4, 1912, amended the charter of the Motorcar Specialty Company, changing its name to the Texas Auto Supply Company, and thereafter the two businesses were operated under the same control and management, and not as competitors.

"I further find that prior to the purchase by the said Texas Auto Supply Company of the capital stock and business of the Motorcar Specialty Company the said Texas Auto Supply Company was doing a large business in the sale of gasoline, and consumed in its business an amount of gasoline greatly in excess of the consumption by the Motorcar Specialty Company, and that it had a large clientage in the sale of gasoline.

"I further find that up to the time of the purchase of the stock and business of the Motorcar Specialty Company by the partnership known as the Texas Auto Supply Company the said Motorcar Specialty Company did not exceed in its demands an amount of gasoline beyond the estimated quantity made at the time the contract was entered as its requirements, but had in fact not required an amount equal to the said estimated quantity, and that after the business of the partnership firm of Texas Auto Supply Company and the business of the Motorcar Specialty Company were operated under the same management there was a large increase in the consumption of gasoline.

"I further find that the market price of gasoline about November, 1912, rose several cents above 9 cents per gallon, and continued to rise until it had more than doubled itself and was 19 or 20 cents per gallon, and that the new owners and managers of the Motorcar Specialty Company widely advertised to the public that they would sell gasoline under the prevailing market prices, and did sell gasoline about 2 cents per gallon below the prevailing market prices, and that such gasoline was sold in large quantities and in bulk amounts to all character of purchasers and to large consumers of gasoline in drums to farmers and in bulk to other large consumers, and that they greatly enlarged the former capacity of the Motorcar Specialty Company to store and sell gasoline by providing additional tanks and drums, and from December, 1912, up to and including May 31, 1913, sold immense quantities of gasoline, and demanded and received from the Gulf Refining Company many thousands of gallons of gasoline in excess of the quantity originally estimated as the probable requirements of the Motorcar Specialty Company, to wit, in December, 1912, 3,910 gallons, in January, 1913, 5,175 gallons, in February, 1913, 8,692 gallons, in March, 1913, 14,388, gallons, in April, 1913, 24,516 gallons, and in May, 1913, 17,437, or a total for the seven months of 74,068 gallons.

"I further find that the Texas Auto Supply Company, by reason of selling the gasoline about 2 cents under the prevailing market price, was enabled to sell gasoline readily in small and large quantities, and did sell the gasoline indiscriminately to any and all persons seeking to buy the same, and that in order to obtain gasoline to sell on the open market indiscriminately to any and all persons the Texas Auto Supply Company in the month of May, 1913, and in the name of the Motorcar Specialty Company, ordered additional quantities of gasoline to be delivered by the Gulf Refining Company, and that the Gulf Refining Company about the 13th day of May, 1913, notified the Texas Auto Supply Company that it would not furnish and deliver during the month of May, 1913, more than 600 gallons of gasoline per day, and refused to accept orders for or deliver more than that amount of gasoline during the month of May, 1913.

"I further find that the Gulf Refining Company delivered to the Motorcar Specialty Company and its successor, the Texas Auto Supply Company, prior to the 1st day of May, 1913, 68,984 gallons of gasoline, and that it delivered to the Texas Auto Supply Company in May, 1913, under orders in the name of the Motorcar Specialty Company, 17,437 gallons in quantities of about 600 gallons daily.

"I further find that the plaintiff, Texas Auto Supply Company, was indebted to the Gulf Refining Company on the 1st day of June, 1913, for gasoline furnished and delivered to it prior thereto under the contract in the sum of $1,597.88, which is due and unpaid, and that the Texas Auto Supply Company is further indebted to the Gulf Refining Company in the sum of $300.20 for 1,580 gallons of gasoline sold and delivered to the Texas Auto Supply Company by the said Gulf Refining Company at the price of 19 cents per gallon during the month of June, 1913, which amount is due and unpaid, together with interest on said sum from the 1st day of January, 1914, at the rate of 6 per cent. per annum, and that the plaintiff Texas Auto Supply Company is now indebted to the Gulf Refining Company in the aggregate amount of $2,277.68.

"I further find that defendant knew of the amended charter of Motorcar Specialty Company, and that Harrison and Lyne became the chief stockholders thereof; that Harrison and Lyne were experienced men in the auto supply business, had a large and valuable trade therein, and large opportunities for the sale of gasoline; that all of the purchases of gasoline by the plaintiff from the time of the amending of the charter thenceforward to the completion of the contract were paid for by the plaintiff to the defendant with its check or draft signed by H. B. Lyne, and defendant delivered all of the gasoline to the plaintiff as in conformity with and in carrying out the terms of the contract in controversy in other words; that all of the deliveries of gasoline by the defendant were made to the plaintiff under and by virtue of the provisions of the contract hereinbefore referred to.

"I further find that the purchases of gasoline on the part of the plaintiff from the defendant from the time of the amending of the charter thenceforward to the completion of the contract were paid for by the plaintiff to the defendant with its check or draft signed by H. B. Lyne, and defendant delivered all of the gasoline to the plaintiff as in conformity with and in carrying out the terms of the contract in controversy; in other words, that all of the deliveries of gasoline by the defendant were made to the plaintiff under and by virtue of the provisions of the contract hereinbefore referred to.

"I further find that the purchases of gasoline on the part of the plaintiff from the defendant from the time of the amended charter thenceforward steadily increased, so that in

January, 1913, the plaintiff purchased and defendant delivered 5,175 gallons, in February following, 8,692 gallons, in March following, 14,388 gallons, in April following, 24,516 gallons, and in May, 17,437 gallons; that defendant knew that plaintiff's management was pushing and aggressive, and that the plaintiff had the facilities for the sale and delivery of large quantities of gasoline; that defendant promptly and expeditiously met every demand of the plaintiff on it for gasoline under and by virtue of the terms of the contract, without objection, until the 13th day of May, 1913, at which time it notified the plaintiff that it would only deliver to it under the terms of the contract 600 gallons per day, as hereinbefore; that at no time did the defendant repudiate or question the terms of the contract or claim to the plaintiff that it was not bound thereon; that it gave as a reason why it would not supply the plaintiff more than 600 gallons per day from the 13th day of May to the expiration of the contract that it was short of gasoline.

"I further find that the plaintiff from the 13th day of May thenceforward to the expiration of the contract to wit, the 30th day of May, 1913, was obliged in order to supply and meet the demands of its business, to go into the open market, and did so do, and buy 13,853 gallons additional to the gasoline that was delivered by the defendant, and paid therefor the market price of 19 cents per gallon. If plaintiff is entitled to recover, it is the sum of $1,385.30, which is the difference between the price nominated in the contract and the 19 cents per gallon for the 13,853 gallons plaintiff was obliged to go into the open market and buy.

"I further find that plaintiff made daily demands on the defendant from the 13th day of May, 1913, to the expiration of the contract for deliveries of gasoline sufficient to supply its demands and business, and was by defendant refused because, as aforesaid, of the alleged shortage.

"Conclusions of Law.

"(1) I conclude that the contract executed between the Motorcar Specialty Company and the Gulf Refining Company was unenforceable and void for want of consideration and mutuality, and was unilateral in that the Motorcar Specialty Company was not required to purchase and receive from the Gulf Refining Company 35,000 gallons of gasoline or any ascertainable quantity of gasoline, and that the quantity of gasoline which the Motorcar Specialty Company might have required during the 12 months commencing June 1, 1912, for its own consumption was entirely dependent upon the will and discretion of the Motorcar Specialty Company in the conduct of its business and upon the continuance or discontinuance, the enlargement or curtailment of its business as determined by the wishes and desires of the Motorcar Specialty Company, the fluctuations of the market price of gasoline, the demands of the public, and other uncertain contingencies, and that therefore the Gulf Refining Company, under the contract, was not legally obligated to accept orders for and deliver the gasoline, and no action for damages lies against it for its failure to deliver the gasoline which it is alleged it failed to deliver.

"(2) I further conclude that it was within the contemplation of the parties to the contract that 100 gallons a day of the 35,000 gallons for the year would be the maximum or a quantity approximating the maximum amount that the Motorcar Specialty Company would require for its own consumption for the year beginning June 1, 1912, and ending May 31, 1913, and such estimate having been made by the parties to the contract at the time it was executed as being the maximum amount or a quantity approximating the maximum amount that the Motorcar Specialty Company would require during the period covered by the contract for its own consumption, the contract should be construed in the light of the intentions of the parties thereto, and that the Gulf Refining Company, having furnished more than 87,000 gallons of gasoline, more than complied with its legal obligations under the contract, and cannot in any event be held liable for damages for the failure to furnish any amount of gasoline in excess of the quantity which was actually delivered.

"(3) I further conclude that, the Texas Auto Supply Company having ordered and received under the contract gasoline in an amount equal to $1,597.88, the said Texas Auto Supply Company is legally indebted to the Gulf Refining Company in that amount and interest thereon from January 1, 1914, and that, the Texas Auto Supply Company having ordered and received from the Gulf Refining Company 1,580 gallons of gasoline in June, 1913, at the current market price of 19 cents per gallon, it is legally liable to the Gulf Refining Company in the sum of $300.-20, together with interest thereon from the 1st day of January, 1914, and that defendant, Gulf Refining Company, is entitled to recover judgment against the plaintiff, Texas Auto Supply Company, in the aggregate amount of $2,277.68."

There is no statement of facts in the record and no attack is made on any of the findings of fact as being unsupported by proof; indeed, any such attack if made would be unavailing in the absence of a statement of facts.

All of appellant's assignments of error are addressed to the court's conclusion that the contract sued on was void for want of consideration and because it was unilateral and lacking in the essential element of mutuality.

Upon that question many authorities are cited and discussed by appellant and appellee, but we deem its determination by this court to be immaterial, since the judgment rendered is correct for the reasons given in the second paragraph of the conclusions of law, the correctness of which is not challenged, and which are to the effect that in making the contract it was contemplated and intended by the parties that appellee would not be bound to furnish exceeding approximately 35,000 gallons of gasoline during the entire period covered by the contract, and that, as more than 87,000 gallons had been furnished, appellee had more than discharged its contractual obligations.

Furthermore, those conclusions are supported by such authorities as Gulf Refining Co. v. Pegues Mercantile Co., 164 S. W. 1113; Gulf Refining Co. v. Brown-Loyd Co., 167 S. W. 162; Holland v. Pierce Fordyce Oil Ass'n, 171 S. W. 1075; Cullinan v. Standard Light & Power Co., 65 S. W. 689.

Upon the trial court's findings of fact and the conclusions of law last referred to and those stated in third subdivision of legal conclusions, all of which we adopt, the judgment is in all respects affirmed.

Affirmed.