**CALPINE PRODUCER SERVICES, L.P., Appellant**

v.

**The WISER OIL COMPANY, Appellee.**

No. 05–04–01025–CV.

Court of Appeals of Texas, Dallas.

Aug. 17, 2005.

J. Robert Beatty and Cynthia Keely Timms, Locke, Liddell & Sapp, L.L.P., Dallas, for Appellant.

D. Ronald Reneker, John L. Thompson, Craddock, Reneker, Davis LLP, and Craig A. Haynes, Thompson & Knight, P.C., Dallas, for Appellee.

Before Justices WRIGHT, MOSELEY and LANG.

## OPINION

Opinion by Justice LANG.

Calpine appeals a summary judgment awarding Wiser damages for natural gas purchased by Calpine under a "Gas Sales and Purchase Agreement." Pursuant to the agreement, Calpine purchased natural gas, "from time-to-time," from Wiser, the producer. Then, Calpine resold the natural gas. The trial court's decision assessing liability and damages was on consideration of cross motions for summary judgment, with many facts being stipulated. The parties agree that the agreement is unambiguous.

In two issues, Calpine asserts that the trial court erred in deciding against Calpine and in favor of Wiser. We decide in Calpine's favor on both issues. Therefore, we reverse and render judgment that Wiser take nothing on its claim against Calpine.

### I. Factual Context and Procedural History

The subject of this action is the interpretation of a "Gas Sales and Purchase Agreement" dated September 1, 1997, between Wiser, as Seller, and Calpine, then known as Highland Energy Company, as Buyer. Pursuant to the agreement, Calpine purchased natural gas from Wiser during November 2001, and resold the gas to Enron, pursuant to a separate resale contract. It

is undisputed that pursuant to the terms of the resale contract between Enron and Calpine, Enron was obligated to pay Calpine $732,906.39 ($727,161.81 of which was payable to Wiser) for the Wiser gas, on or before December 26, 2001. In early December 2001, Enron filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code and did not pay for the gas as provided in its resale contract with Calpine.

Since Calpine failed to pay Wiser for the gas, Wiser sued Calpine on March 28, 2002, seeking recovery of the full purchase price of the gas based on Calpine's alleged breach of the agreement. Calpine answered the suit, asserting failure of a condition precedent as an affirmative defense.

During the pendency of this action, Calpine filed a proof of claim in the Enron bankruptcy making claims for sums due regarding gas resold to Enron by Calpine for Wiser and other companies. Calpine's proof of claim against Enron was settled and Calpine was paid a portion of its claim. Then, Calpine paid Wiser $254,495.49 for the Wiser gas. This $254,495.49 was equal to 61.45% of Calpine's total recovery from Enron, which, according to Calpine, represented Wiser's proportionate share of Calpine's claim against Enron. Wiser now claims that Calpine owes the remaining balance of the original amount due under the agreement.

Both Calpine and Wiser moved for summary judgment based on the gas purchase agreement's unambiguous language. Calpine's motion for summary judgment was granted, in part, and Wiser's was denied.

Then, the trial court granted Wiser's motion for reconsideration and vacated the partial summary judgment in favor of Calpine. The parties filed stipulations concerning certain facts and renewed their motions for summary judgment. At that point, the trial court granted Wiser's motion for summary judgment, denied Calpine's motion, and entered judgment for Wiser. Calpine timely filed its notice of appeal.

The basic relationship between Calpine and Wiser is outlined in the recitals and paragraph 2.1:

WHEREAS, Seller owns or controls certain natural gas production from properties in which it owns an interest and which are more particularly described herein.

WHEREAS, Seller may have available for sale volumes of said natural gas production from time-to-time; and

WHEREAS, Buyer may have markets for and may desire to purchase all or a portion of said production from time-to-time subject to the provisions of this Purchase Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, Seller and Buyer do hereby covenant and agree as follows:

. . . .

2.1 Subject to the other provisions hereof, Seller commits to the performance of this Purchase Agreement the Daily Purchase Quantity and grants to Buyer the sole and exclusive right to purchase such gas during the term hereof, and Buyer commits to use good faith and all reasonable efforts to purchase pursuant to the Purchase Agreement the Daily Purchase Quantity.

. . . .

Paragraph 6.1 provides for sale and delivery:

6.1 Gas sold and delivered hereunder shall be delivered at the Point of Delivery. Additional provisions set out the

mechanics for the pricing of and payment for the gas purchases:

7.1 The price to be paid by Buyer to Seller for all gas purchased hereunder during each month shall be based upon the Average Daily Volume (as hereinafter defined) in effect for that month and shall be the weighted average of the applicable percentages set forth below multiplied by the *Net Proceeds (as hereinafter defined) received by Buyer for gas owned or controlled by Seller and resold by Buyer* under the Resale Contract(s), it being understood that Buyer shall utilize reasonable efforts in entering into Resale Contract(s) to obtain the best terms (including without limitation price terms) reasonably available in the area where the subject gas was produced:

. . . .

As used herein "Average Daily Volume" shall mean the arithmetic average daily volume of gas purchased by Buyer hereunder obtained by dividing the total volume of gas purchased by Buyer hereunder during a month by the number of calendar days in that month and rounding the result to the next whole number. *As used herein, the term "Net Proceeds" shall mean, with respect to any particular calendar month, the difference between "Gross Proceeds" for such calendar month and "Authorized Costs" for such calendar month, where "Gross Proceeds" equal the sum of* (a) *the gross proceeds received by Buyer for gas owned or controlled by Seller and resold by Buyer* under the Resale Contract(s) during such calendar month, and (b) the amount of any imbalance penalty or similar charge that benefits Buyer and Seller for

such calendar month, and further where "Authorized Costs" equal the sum of (a) any reasonable transportation, gathering or similar third party charges, or third party charges for fuel or line loss, incurred by Buyer and paid for such calendar month, and (b) subject to proviso contained in the last sentence of Section 4.2 hereof, 100% of any imbalance penalty charges for such calendar month.

. . . .

8.1 Buyer shall make payment to Seller for all volumes of gas delivered at the Point of Delivery hereunder which are purchased by Buyer from Seller and resold under the Resale Contract(s). *Buyer shall make payment to Seller on the later of either (i) the last day of the month of production or (ii) within five (5) business days of the date it receives payment from its customers* under the Resale Contract(s) *for gas purchased hereunder;* in no event, however shall Buyer enter into any Resale Contract that does not mandate that the purchaser make payment within 90 days following the date the subject production is delivered at the Point of Delivery. If requested by Seller, payments by Buyer to Seller shall be made by electronic funds transfer prior to 1:00 p.m. Central Time on the date payment is due as specified herein. (emphasis added).

## II. Standard of Review

This Court reviews a summary judgment *de novo* to determine whether a party's right to prevail is established as a matter of law. *Dickey v. Club Corp. of Am.,* 12 S.W.3d 172, 175 (Tex.App.-Dallas 2000, pet. denied). The standards for re-

viewing a traditional summary judgment are well-established. *See Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). A party moving for traditional summary judgment carries the burden of establishing that no material fact issue exists and that it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex.2000) (per curiam). When reviewing a motion for summary judgment, the court takes the nonmovant's evidence as true, indulges every reasonable inference in favor of the nonmovant, and resolves all doubts in favor of the nonmovant. *Willrich*, 28 S.W.3d at 23–24. To establish it is entitled to summary judgment, a defendant must either disprove an element of the plaintiff's case or prove each element of an affirmative defense. *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex.1991).

Further, on cross-motions for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law. *See Guynes v. Galveston County*, 861 S.W.2d 861, 862 (Tex. 1993). When the trial court grants one motion and denies the other, the reviewing court should determine all questions presented. *See Comm'rs Court of Titus County v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997); *Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex.1988). The reviewing court should render the judgment that the trial court should have rendered. *See Agan*, 940 S.W.2d at 81; *Members Mut. Ins. Co. v. Hermann Hosp.*, 664 S.W.2d 325, 328 (Tex.1984).

### III. Applicable Law

▮ Under Texas law, if there is no ambiguity in a written contract, "its construction and meaning become a question of law for the court to determine." *Dedier v. Grossman*, 454 S.W.2d 231, 234 (Tex.

Civ.App.-Dallas 1970, writ ref'd n.r.e.). When interpreting an unambiguous contract, it is well established that "the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). In order to achieve this objective, "courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of a contract so that none will be rendered meaningless." *Id.* The court should consider that the "intent of the parties must be taken from the agreement itself, not from the parties' present interpretation, and the agreement must be enforced as it is written." *Parts Indus. Corp. v. A.V.A. Servs., Inc.*, 104 S.W.3d 671, 678 (Tex.App.-Corpus Christi 2003, no pet.). This is often referred to as the "Four Corners Rule" which means that the intention of the parties is to be ascertained from the instrument as a whole and not from isolated parts thereof. *See, e.g., Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002) (per curiam); *Burrus Mills, Inc. v. Hein*, 378 S.W.2d 85, 88 (Tex.Civ.App.-Dallas 1964, writ dism'd); *Ervay, Inc. v. Wood*, 373 S.W.2d 380, 384 (Tex.Civ.App.-Dallas 1963, writ ref'd n.r.e.). Moreover, a court will not change the contract merely because it or one of the parties comes to dislike its provisions or thinks that something else is needed. *Natural Gas Clearinghouse v. Midgard Energy Co.*, 113 S.W.3d 400, 407 (Tex.App.-Amarillo 2003, pet. denied) (citing *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 888–89 (Tex. 1998)). The court will not "ask about the subjective intent of the parties to the contract." *Vincent v. Bank of Am., N.A.*, 109 S.W.3d 856, 867 (Tex.App.-Dallas 2003, pet. denied). When the contract is unambiguous, the court should apply the pertinent rules of construction, apply the plain meaning of the contract language, and enforce the contract as written. *Id.*

## IV. Discussion and Analysis

As in most cases where the court must determine the meaning of unambiguous contract language, the parties' views are in sharp contrast. While Wiser asserts Calpine has an absolute obligation to pay, Calpine contends that the agreement does not require it to pay for gas purchased by third parties until Calpine receives payment for that gas.

In support of this position, Calpine cites us to two particular parts of the agreement which Calpine argues must be read together in order to interpret the agreement. First, Calpine argues that paragraph 8.1 states, in part, that payment to Wiser is due only after Calpine "receives payment from its customers." This provision, according to Calpine, is a condition precedent to payment. Second, we are cited to paragraph 7.1, which describes how payments to Wiser are to be calculated. That provision directs that the amount of each payment to Wiser is to be determined by multiplying a designated percentage figure, which reduces as the volume of gas sold rises, to the amount of money "received by" Calpine from the third-party purchaser in respect of that gas.

On the other hand, Wiser posits that the provision for payment in the first sentence of paragraph 8.1 is an absolute obligation of Calpine to pay. Wiser asserts that the balance of that paragraph, which Calpine argues dictates that no payment is required to be made to Wiser unless Calpine is paid, is merely a timing provision, not a limitation on the obligation to pay as a condition precedent. However, in the motion for summary judgment briefing, in particular, Wiser argued that Calpine's obligation to pay arises within a "reasonable time" after the third-party purchaser should have paid Calpine. Further, it argued in the motion for summary judgment that section 9.343 of the Texas Business and Commerce Code demonstrates that the Texas legislature has placed a producer of natural gas in a favored position "as regards their right to be paid by purchasers of their gas."[1] Wiser contends that no condition precedent exists in the agreement's language. It asserts that a true condition precedent would set out language as a clear limitation, but that no such language is evident in this agreement. Also, Wiser tells us that imposing a condition precedent upon them would effect a forfeiture and would lead to an absurd result since the payment obligation is absolute.

The cases cited to us by Wiser address primarily whether the language in paragraph 8.1 can be construed as a condition precedent. Several of those cases address the rules of construction which direct us in ascertaining whether a provision is a condition precedent and how it is to be applied. The leading authority on this point offered by Wiser is *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945 (Tex.1990). *Criswell*, along with the other cases Wiser cites, states the rule that conditions precedent are not favored and that construction establishing conditions precedent and resulting forfeitures must be avoided unless the language will admit of no other construction.

In *Criswell*, the Texas Supreme Court noted that "[b]ecause of their harshness in operation, conditions are not favorites of the law." *Id.* The Supreme Court directed that in construing a contract, "forfeiture by finding a condition precedent is to be avoided when another reasonable reading

---

**1.** Section 9.343 provides a security interest in favor of a selling interest owner to secure the obligations of the first purchaser to pay for natural gas. Tex. Bus. & Com.Code Ann. § 9.343 (Vernon 2002).

of the contract is possible." *Id.* The court advised that "[i]n order to make performance specifically conditional, a term such as 'if,' 'provided that,' or some similar phrase of conditional language must normally be included." *Id.* at 948. Furthermore, "[w]hile there is no requirement that such phrases be utilized, their absence is probative of the parties' intention that a promise be made, rather than a condition imposed." *Id.* Yet, in that case, the Supreme Court did not strike down the condition precedent to payment since the condition, a sale of the shopping center, was met.

In addition to *Criswell,* Wiser cites us several cases involving construction contracts. Those cases uniformly refuse to construe language as a condition precedent which plainly conditions payment of a contractor or subcontractor on the occurrence of an event, such as payment of the contractor by the owner. *Gulf Constr. Co., Inc. v. Self,* 676 S.W.2d 624 (Tex.App.-Corpus Christi 1984, writ ref'd n.r.e.) (subcontract provision was in the nature of a modification of the time provision which immediately preceded it in the first sentence of that paragraph and did not establish a condition precedent); *Sheldon L. Pollack Corp. v. Falcon Industries, Inc.,* 794 S.W.2d 380 (Tex.App.-Corpus Christi 1990, writ denied) (payment provision was merely covenant that modified time and manner of payment, not condition of liability); *Wisznia v. Wilcox,* 438 S.W.2d 874 (Tex.Civ.App.-Corpus Christi 1969, writ ref'd n.r.e.) (contract containing express, unqualified and unconditional promise on the part of architect to pay structural engineer obligated architect to pay for labor performed and services rendered and that such obligation was not conditioned on architect's being paid). We decline to follow that line of authorities.

Each construction case cited by Wiser relies upon a set of conclusions by the court of appeals in *Gulf Construction* about the construction business which is not set forth in the agreement language construed. In *Gulf Construction,* the court described the expectations in the construction business that the solvency of the owner is a credit risk to be borne by the general contractor, which burden is eased by mechanics liens and installment payments. *Gulf Construction,* 676 S.W.2d at 628. The court said, "[t]hese evidence the intention of the parties that the contractor be paid even though the owner may ultimately become insolvent. This expectation and intention of being paid is even more pronounced in the case of the subcontractor whose contract is with the general contractor, not with the owner." *Id.* Accordingly, in order to transfer this normal credit risk incurred by the general contractor to the subcontractor, "the contract between the general contractor and the subcontractor should contain an express condition clearly showing that to be the intention of the parties." *Id.* at 628–29; *see also Falcon Industries,* 794 S.W.2d at 384; *Wisznia,* 438 S.W.2d at 877. Even assuming these construction industry considerations could properly be relied on to interpret unambiguous language, those considerations are not shown to be applicable, even by analogy, to the case before us.

As further argument, Wiser asserts that *Prickett v. Lendell Builders, Inc.,* 572 S.W.2d 57 (Tex.Civ.App.-Eastland 1978, no writ), supports its position that a provision which sets forth timing like that in paragraph 8.1, in the face of an absolute obligation to pay, is not a condition precedent. The *Prickett* case, which was decided at least six years before *Gulf Construction,* addressed a provision in a construction contract pertaining to payment of a subcontractor: "Payment shall be made monthly, within five (5) days after Con-

tractor ... is paid for the same work by ... [owner]." *Id.* at 58. The court of appeals looked at the contract as a whole, including a provision which stated that a sum certain would be paid upon completion ("$109, 645.00, an estimated price"). The court of appeals concluded that the monthly payment provision was merely descriptive of how progress payments would be made and was not a condition precedent. *Id.* at 59.

The agreement before us is materially different from the one reviewed by the Eastland Court of Appeals in *Prickett.* The interrelation of the language in paragraphs 8.1 and 7.1 makes it clear that the second sentence in paragraph 8.1 is not merely descriptive of timing. Instead, it requires payment to Wiser when Calpine "receives payment" for the gas. In order to adopt the meaning espoused by Wiser, we would be required to inject into the agreement a specific requirement that where the third-party purchaser does not pay Calpine, Calpine must pay Wiser for the gas within a reasonable time of when the third-party *should have* paid Calpine. We have been shown no authority or agreement language upon which that interpretation can be based.

Wiser also asks us to apply, what it asserts is, an industry "expectation" of financial protection to the seller of gas which Wiser suggests is based upon section 9.343 of the Texas Business and Commerce Code. Wiser reasons that when the legislature passed section 9.343, it intended to provide interest owners and sellers of natural gas such as Wiser a favored position regarding their right to be paid for the gas by the first purchaser. We are urged to impose this "expectation" in a similar way as the industry expectations were applied in *Gulf Construction* and its progeny. However, even were we disposed to consider injecting some industry "expectation" into the agreement, we do not acknowledge that section 9.343 should be interpreted to create an industry-wide "expectation" as asserted by Wiser.

A reading of the plain language of section 9.343 reflects the imposition of a security interest in favor of the interest owner of gas to protect its right to payment for gas sold to the first purchaser. TEX. BUS. & COM.CODE § 9.343; *see McIntyre v. Ramirez,* 109 S.W.3d 741, 745 (Tex.2003) (unambiguous statutory language will be interpreted according to its plain meaning). While it could be said that section 9.343 is favorable to an interest owner, that favor is limited to the security interest expressly provided. We have been shown no authority which requires that those lien rights set out in section 9.343 should be translated into implicit or inherent agreement provisions providing for an absolute obligation by Calpine to pay as suggested by Wiser.

In resolving these issues, we subscribe to the reasoning of the Fourteenth Court of Appeals in *Clear Lake City Water Auth. v. Kirby Lake Dev. Ltd.,* 123 S.W.3d 735 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). In that case, a group of developers brought suit against the district for, among other things, breach of a contract in which the district agreed to pay for a portion of the developers' costs incurred in constructing water and sewage facilities on properties within the district. The district contended that the payment provision of the contract unambiguously provided that the developers were to be paid only out of legally available and allocated voter-approved bond funds. *Id.* at 742. The developers, on the other hand, argued that the district had agreed to pay, as soon as possible from any available source, including revenue bonds, which do not require voter approval. *Id.* The court, after reviewing the contract in its entirety, concluded that while the district obligated it-

self to purchase the completed facilities as soon as possible, that requirement did not arise until after the district received the proceeds of voter-approved bond funds. *Id.* at 744. In reaching that conclusion, the court of appeals rejected the developers' contention that receipt of voter-approved bond funds was not a condition precedent. Rather, "the payment provision of the contracts unambiguously provides that the [district's] obligation to pay is expressly conditioned upon the receipt of voter-approved bond funds." *Id.* at 745.

■ On this record, the judgment in Wiser's favor, including the damages assessed, could only be based upon an interpretation of the agreement that Calpine has an absolute obligation to pay Wiser for gas which *should have been paid* for by Enron to Calpine. To interpret the language of the agreement as Wiser suggests, and as accepted by the trial court, would require us to inject meaning not expressed in the words chosen by the parties and placed within the four corners of the agreement. In our *de novo* review, we have rejected Wiser's central proposition that Calpine had an absolute obligation to pay for the gas whether or not Calpine was paid by its purchaser of that gas. Rather, we have concluded Calpine was obligated to pay Wiser when it "receives payment" from Calpine's purchaser of the Wiser gas. "In an unambiguous contract, we will not imply language, add language, or interpret it other than pursuant to its plain meaning." *Natural Gas Clearinghouse,* 113 S.W.3d at 407.

In addition to ordering that Wiser recover from Calpine in damages and attorney's fees, the judgment declares that Wiser holds a first lien security interest to secure payment of its damages, pursuant to section 9.343 of the Business and Commerce Code, in some unspecified oil and gas production which is owned by Calpine and to be identified through post-judgment discovery. The judgment authorizes foreclosure by judicial or nonjudicial means, as allowed by law. However, this lien could arise only by virtue of the trial court's determination that Calpine had breached the agreement by failing to pay for the gas. Since we have determined that the trial court's judgment imposing that liability upon Calpine is to be reversed, we reverse and render the judgment imposing the lien along with the rest of the terms of the judgment. We decide Calpine's issues in its favor.

### V. Conclusion

We conclude that the trial court erred in granting summary judgment in Wiser's favor and refusing to grant Calpine's motion for summary judgment. The trial court should have granted Calpine's motion for summary judgment and denied Wiser's. Accordingly, we reverse the judgment of the trial court and render judgment that Wiser take nothing.