MATHESON TRI–GAS, INC., Appellant,

v.

ATMEL CORPORATION and Atmel Texas, L.P., Appellees.

No. 05–09–01155–CV.

Court of Appeals of Texas, Dallas.

July 27, 2011.

Rehearing Overruled Aug. 29, 2011.

Jeffrey S. Davis, Mike Seely, Gardere Wynne Sewell LLP, Houston, Stacy R. Obenhaus, Gardere Wynne Sewell LLP, Dallas, for Appellant.

Ashley T. Kisner, P. Michael Jung, N. Tobias Smith, Strasburger & Price, LLP,

Paulo B. McKeeby, Morgan, Lewis & Bockius LLP, Dallas, for Appellees.

Before Justices MORRIS, LANG, and LANG–MIERS.

## OPINION

Opinion By Justice LANG–MIERS.

Appellant Matheson Tri–Gas, Inc. appeals a summary judgment granted in favor of Atmel Corporation and Atmel Texas, L.P. (together, Atmel) arising out of a dispute regarding a nitrogen pipeline supply agreement between Matheson and Atmel. For the following reasons, we affirm the trial court's judgment.

### BACKGROUND

Matheson produces and sells industrial and specialty gases from its plant in Irving, Texas. Atmel purchased a semiconductor facility in Irving. In August 2000, Atmel and Matheson executed a Nitrogen Pipeline Supply Agreement (Supply Agreement) in which Matheson agreed to build a pipeline to Atmel's facility and supply nitrogen to Atmel for a period of 10 years, later extended to 12 years, and Atmel agreed to purchase a minimum amount of nitrogen each month beginning in December 2000. Atmel began manufacturing operations in early 2002, but by July 2002, Atmel shut down its operations and ceased taking nitrogen in production levels from Matheson. However, Atmel continued to pay Matheson the minimum amount required under the Supply Agreement because it was a take-or-pay agreement. It also continued to use small amounts of nitrogen for facility maintenance purposes.

In late 2006, Atmel told Matheson that Atmel was negotiating the sale of its Irv-

ing facility to Maxim Integrated Products, Inc. Atmel told Matheson that Maxim was not interested in buying out Atmel's remaining years under the Supply Agreement and, instead, Maxim wanted to negotiate its own supply agreement with Matheson. Matheson and Maxim executed a Nitrogen Purchase and Sale Agreement (the MTG/Maxim Agreement) in February 2007. Matheson, Atmel, and Maxim also executed a Termination Agreement whereby Atmel would be released from its obligations to Matheson under the Supply Agreement upon the occurrence of four conditions:

> (1) Atmel has closed on the sale of the asset of the Irving Facility assets to Maxim; and (2) Atmel pays to MTG the Early Termination Charge ... within one (1) business day of the effective date set forth in subsection (viii) below by way of wire transfer to the account specified in subsection (x) below; and [ (3) ] Atmel has paid all outstanding invoices due; and (4) Maxim begins consuming product under the new MTG/Maxim Nitrogen Pipeline Supply Agreement.

The Termination Agreement obligated Atmel to continue to pay the monthly minimum to Matheson per the Supply Agreement until all four conditions in the Termination Agreement had been satisfied.

Atmel closed on the sale of its facility to Maxim on May 7, 2007. Later that month, Matheson invoiced Atmel for the minimum purchase amount as stated in the Supply Agreement. Atmel did not pay the invoice. In fact, Atmel did not pay any of the invoices sent to it by Matheson after May 2007. Matheson sued Atmel for, among other things, breach of contract.

Both parties filed motions for summary judgment.[1] Atmel moved for summary

---

1. Multiple motions were filed. The motions that are the subject of this appeal are Atmel's

judgment on the ground that its Supply Agreement with Matheson terminated on May 7, 2007, the closing date of the sale of Atmel's facility to Maxim, and, consequently, Matheson could not prove an essential element of its breach of contract cause of action, namely, the existence of a contract. Atmel argued that Maxim had begun to consume nitrogen under the MTG/Maxim Agreement on the closing date because it used small quantities of nitrogen for maintenance and facilities purposes. Atmel contended that condition four of the Termination Agreement was satisfied by Maxim's consumption of nitrogen and that Atmel was released from its obligations under the Supply Agreement. Matheson responded that Maxim had not begun consuming nitrogen "under the MTG/Maxim Agreement" because that agreement was a take-or-pay agreement for production levels of nitrogen, not de minimis quantities of nitrogen for maintenance and facilities purposes. Matheson raised this same issue in its motion for summary judgment and argued that it was entitled to summary judgment on its breach of contract claim because condition four of the Termination Agreement had not been satisfied. The trial court granted Atmel's motion and denied Matheson's. Matheson appeals those rulings.

### STANDARD OF REVIEW

We review a traditional summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *Dickey v. Club Corp. of Am.*, 12 S.W.3d 172, 175 (Tex.App.-Dallas 2000, no pet.). A party moving for traditional summary judgment under rule of civil procedure 166a(c) is charged with the burden of establishing that no genuine is-

sue of material fact exists and that it is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c). If the movant discharges its burden, the burden shifts to the nonmovant to present to the trial court any issues that would preclude summary judgment. *Hackberry Creek Country Club, Inc. v. Hackberry Creek Home Owners Ass'n*, 205 S.W.3d 46, 50 (Tex.App.-Dallas 2006, pet. denied). When, as here, both parties move for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law; neither party can prevail because of the other's failure to discharge its burden. *Id.*

### DISCUSSION

In two issues, Matheson argues that the trial court erred by granting Atmel's motion for summary judgment and denying Matheson's motion for final summary judgment and no-evidence motion for summary judgment. In issues three and four, Matheson argues that the trial court erred by overruling Matheson's objections to Atmel's summary judgment evidence and by determining that damages should be calculated under the UCC. In its fifth issue, Matheson discusses the relief to which Matheson is entitled if it prevails on appeal.

The question this appeal presents is whether condition four in the Termination Agreement occurred thereby relieving Atmel of its obligations under the Supply Agreement. Condition four required that "Maxim begins consuming product under the new MTG/Maxim Nitrogen Pipeline Supply Agreement." Atmel contended that Maxim began consuming nitrogen when it purchased Atmel's facility in May 2007 because Maxim used nitrogen from

first amended motion for summary judgment filed on March 17, 2009, and Matheson's motion for final summary judgment and no-evi-

dence motion for summary judgment filed on March 20, 2009.

Matheson for "various vital maintenance and facilities uses" even though it had not begun consuming production levels of nitrogen. Matheson, on the other hand, contended that the parties intended that the MTG/Maxim Agreement would not take effect until Maxim began consuming nitrogen in production levels, not de minimis quantities necessary for maintenance and facilities purposes.

 The parties state that the agreements are not ambiguous, and we agree that they are not. The construction of an unambiguous contract is a question of law, which we review de novo. *MCI Telecomm. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 650–51 (Tex.1999). Our primary concern is to determine the true intent of the parties as expressed in the agreement. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). To determine the parties' intent, we examine the entire agreement and give effect to all its provisions so that none are rendered meaningless. *Id.* We do not consider the parties' present interpretations of the agreement. *Calpine Producer Servs., L.P. v. Wiser Oil Co.,* 169 S.W.3d 783, 787 (Tex.App.-Dallas 2005, no pet.). And we are not concerned about the parties' subjective intent. *Id.* Undefined words used in an agreement are given their plain, ordinary, and generally accepted meanings unless the agreement shows the parties used them in a technical or different sense. *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex. 1996).

We begin by examining the language of the respective agreements. As we stated, the Termination Agreement requires that "Maxim begins consuming product under the new MTG/Maxim Nitrogen Pipeline Supply Agreement." To determine whether Maxim began "consuming product under" the MTG/Maxim Agreement, we look to the language of that agreement. The MTG/Maxim Agreement begins:

This AGREEMENT, effective this 21st day of February, 2007, between MATHESON TRI–GAS, INC., ... ("Seller") and Maxim Integrated Products, Inc. ... ("Buyer").

1. SALE AND PURCHASE.

Seller agrees to sell and Buyer agrees to purchase all of Buyer's present and future requirements, during the term of the Agreement, of Nitrogen for Buyer's Site.

The agreement contains provisions about the quantity of nitrogen that Matheson will make available to Maxim, how the nitrogen will be delivered, and Maxim's maximum and minimum withdrawal rates. Like Atmel's Supply Agreement with Matheson, the MTG/Maxim Agreement is a take-or-pay agreement. It states that it is effective as of the date of the agreement, which was February 21, 2007 and that its term commences "on or about March 15, 2007 or as otherwise agreed upon by the parties in writing." It does not state that it commences only when Maxim consumes production levels of nitrogen. Instead, it states that Maxim "agrees to purchase *all of Buyer's present and future requirements, ... of Nitrogen for Buyer's Site.*" (emphasis added). According to its plain language, the MTG/Maxim Agreement required Maxim to purchase from Matheson any and all nitrogen that Maxim used at its site, even if the amount was de minimis.

 Matheson argues that "consuming product under" the MTG/Maxim Agreement can only be interpreted as consumption at production levels. It cites cases to support its argument, but those cases did not involve language like that used in the agreements at issue in this case. *See Tex. Auto Supply Co. v. Gulf Refining Co.,* 204 S.W. 457, 457–59 (Tex.Civ.App.-Fort Worth 1918, writ ref'd) (interpreting con-

tract providing for sale of "35,000 gallons or such quantity of store gasoline as the buyer may require during that time for its own consumption" to mean that 35,000 gallons was the maximum amount of gasoline the parties intended would be required by the buyer over the contract period and that seller, by delivering 87,000 gallons of gasoline to buyer's successor, more than complied with its obligations under the contract); *Garcia v. King*, 139 Tex. 578, 164 S.W.2d 509, 509 (1942) (construing the term "produce" as used in oil and gas lease). And as we have stated, the MTG/Maxim Agreement requires that Maxim purchase all of its requirements of nitrogen at the Irving site from Matheson. It does not state that Maxim must consume production levels of nitrogen before the agreement takes effect.

Matheson also argues that condition four is rendered meaningless if Maxim automatically began consuming nitrogen on the closing date of the sale. Matheson contends that if the parties intended that result, there would have been no reason to include condition four in the Termination Agreement. But the closing on the sale (condition one) and the consumption of nitrogen (condition four) are two distinct actions, separate and independent from each other. If Maxim had not consumed any nitrogen, the Termination Agreement would not have become effective until Maxim did consume nitrogen. Consequently, this interpretation does not render condition four of the Termination Agreement meaningless. We conclude that the plain language of the phrase "consuming product under" the MTG/Maxim

Agreement means any consumption of nitrogen, not some minimum quantity.

■ We now consider whether Atmel produced summary judgment evidence establishing that Maxim consumed nitrogen beginning on May 7, 2007.[2] Atmel presented the following summary judgment evidence: (1) the deposition testimony of Jeff Hannon, Maxim's former executive overseeing its operation and maintenance, who testified that prior to its purchase of the Atmel facility, Atmel used nitrogen for the HVAC system and that Maxim continued to use nitrogen for that purpose until it was able to turn on the compressed air system, which occurred sometime in the summer of 2007; (2) the deposition testimony of Richard Johnson, Maxim's facilities manager, who testified that it was his understanding that nitrogen was the gas that was being used to perform pneumatic functions at the facility, and that there were no other sources of compressed gas coming into the facility when Maxim purchased it; (3) the deposition testimony of Daniel Lambert, Matheson's corporate representative, who testified that the MTG/Maxim Agreement was effective and enforceable on May 1, 2007; and (4) purchase orders showing that Maxim had to purchase nitrogen cylinders and support equipment in early fall 2007 to perform preventive maintenance at the facility because Matheson had shut down the nitrogen supply to the facility.[3]

We conclude that Atmel's summary judgment evidence was sufficient to establish that Maxim consumed nitrogen on the closing date of the sale and that condition four had been satisfied. It then became

---

**2.** We do not consider any of the evidence that Matheson argues in issues three and four should have been excluded below.

**3.** The record shows that when the dispute arose over whether Maxim "consumed nitro-

gen under" the MTG/Maxim Agreement that Matheson closed the valve on the pipeline into the Maxim facility cutting off the nitrogen supply. This appears to have occurred sometime in summer or early fall 2007.

Maxim's burden to raise a genuine issue of material fact on this element. But Matheson did not dispute this summary judgment evidence in its response below or on appeal. Instead, it argued that this de minimis use of nitrogen does not qualify as "consuming product under" the MTG/Maxim Agreement. Because we have concluded otherwise, we further conclude that the trial court did not err by granting Atmel's motion for summary judgment.

We resolve issue one against appellant. Because of our disposition of this issue, we do not need to consider appellant's remaining issues. We affirm the trial court's judgment.