HINTON PRODUCTION COMPANY, Charles A. Hinton, Independent Executor of Clara G. Hinton, Deceased, and Hinton Estates Partnerships, Appellants

v.

ARCADIA EXPLORATION AND PRODUCTION COMPANY, Appellee.

No. 05–07–00852–CV.

Court of Appeals of Texas, Dallas.

Aug. 21, 2008.

---

Jay A. Brandt, Jay A. Brandt, P.C., Dallas, for Appellant.

F. Franklin Honea II, Law Offices of F. Franklin Honea, Dallas, for Appellee.

Before Justices WRIGHT, O'NEILL, and FRANCIS.

## OPINION

Opinion by Justice FRANCIS.

Hinton Production Company, Charles A. Hinton, independent executor of Clara G. Hinton, Deceased, and Hinton Estates Partnerships appeal the trial court's summary judgment in favor of Arcadia Exploration and Production Company. In four issues, appellants contend summary judgment was improper because the trial court ignored precedent and provisions of the parties' agreement, the trial court did not adjudicate their equitable causes of action, genuine issues of material fact exist, and their claims were not barred by limitations. We affirm.

In 1994, appellants assigned their "right, title, and interest" in oil leases to appellee. Among various other items assigned along with the leases, appellants also assigned their right, title, and interest to contracts and agreements "relating to or affecting the Leases, Lands and Wells, or used in connection therewith...." The parties signed an Amended and Restated Purchase and Sale Agreement ("the PSA") on November 28, 1994. Under the terms of the PSA, the "effective date" of the assignment was August 1, 1994 at 7:00 a.m. The PSA established a preliminary sale price of $2,382,518 to be adjusted by various expenses incurred and proceeds received during the interval between the effective time of the sale on August 1 and the closing date at the end of November. The parties executed an assignment and bill of sale on November 29, 1994.

In 1998, a federal class action lawsuit was filed alleging that various oil companies had conspired to underpay oil producers by setting artificially low posted prices at the wellhead during a period between 1986 and 1998. The law firm of Winstead, Sechrest & Minick ("Winstead") represented both appellants and appellee in the suit. Winstead filed overlapping claims for the parties seeking to qualify them for payments in a proposed global settlement. Under the settlement negotiated ("the first settlement"), the defendants contributed a set amount of money which was distributed among the class members under a formula utilizing the number of barrels each claimant had produced. According to the claim appellee submitted, the parties were underpaid on 5,477,343 barrels of oil of which 2,231,140 barrels of oil, representing 41% of the total, was produced while appellants operated the leases.

Most of the class members, including appellants, accepted the first settlement. A few members, however, including appellee, appealed the settlement to the Fifth Circuit Court of Appeals. In their appellate brief, the appealing class members criticized the settlement for creating a substantial disparity between the recoveries of "first tier" royalty interest owners on the

one hand and "second tier" royalty interest owners and working interest owners on the other hand.

In 2001, the appealing class members and defendants settled the appeal. Under the terms of the appeal settlement ("the second settlement"), the appealing class members dismissed their appeal in exchange for an "additional payment" from the defendants that was substantially more than the nonappealing class members would receive. The additional payment for the second settlement was conditioned upon the finalization of the overall global settlement of the class action lawsuit. When the settlements were finalized, appellants received a settlement check in the amount of $63,000. Appellee received a settlement check in the amount of $1,021,000.

The parties dispute how, or if, the settlement proceeds should be divided between them. Appellants contend they are entitled to share in the $1,021,000 awarded to appellee because it represents proceeds for underpayments of oil taken while they owned the leases. Appellee, in turn, contends it is entitled not only to the $1,021,000, but also to the $63,000 that appellants received. Appellee contends the "right, title, and interest" it received from appellants in the assignment includes appellants' interest in the class action lawsuit. Appellee further contends the additional payment in the second settlement was a negotiated payment rather than compensation for barrels of oil. The trial court agreed with appellee, granted appellee's summary judgment motion in its entirety, and expressly concluded appellants had assigned to appellee their right to pursue additional payment derivative from barrels of oil. The trial court entered summary judgment granting appellee all of the settlement proceeds. While this suit is pending, Winstead holds in escrow the $63,000 check payable to appellants.

In reviewing the trial court's determination to grant appellee traditional summary judgment, we determine whether appellee met its summary judgment burden by establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985). We indulge every reasonable inference and resolve all reasonable doubt in appellants' favor, and we take as true all evidence favorable to them. *See Nixon*, 690 S.W.2d at 548–49.

■ In their first issue, appellants contend the trial court erred in granting summary judgment to appellee because it failed to follow applicable legal precedent and did not give effect to express language in the PSA. The precedents appellants contend the trial court ignored are *East Texas Refining Company v. Helvir Oil Company*, 82 S.W.2d 392 (Tex.Civ.App.-Dallas 1935, writ dism'd w.o.j.) and *Phillips Petroleum Company v. Adams*, 513 F.2d 355, 363–64 (5th Cir.1975). Appellee responds that *Helvir* and *Phillips* are distinguishable and that we instead should follow *OTC Petroleum Corporation v. Brock Exploration Corporation*, 835 S.W.2d 792 (Tex.App.-Amarillo 1992, writ denied). We agree with appellee.

In *Helvir*, the plaintiff pumped oil from leased wells and delivered it to defendant's refinery. *See Helvir*, 82 S.W.2d at 392. Before defendant paid for the oil runs, plaintiff assigned its interest in the oil lease to a third-party purchaser. *See id.* at 393. Although plaintiff's agent who negotiated the sale was authorized to sell only the lease, he exceeded his authority and sold both the lease and the accrued oil runs. *See id.* He drafted a letter to the defendant authorizing it to pay the third-party purchaser for the oil runs accrued before the assignment. *See id.* In the

ensuing lawsuit, the trial court found the agent acted without authority and awarded the plaintiff judgment for the value of the oil. *See id.* at 394. In affirming the trial court's judgment, this Court concluded that the evidence supported the trial court's finding that the agent sold the oil runs and drafted his letter without authority. In explaining why the wording of the assignment itself did not convey the accrued oil runs to the third-party purchaser, the Court stated that because the oil had already been extracted, sold, and delivered to the defendant, a mere assignment of the real property oil lease would not also convey the accrued oil runs. *See id.* at 395.

In *Phillips*, the Fifth Circuit addressed the ownership of suspense funds held by the plaintiff oil company while awaiting a ruling from federal regulators regarding a requested rate increase for casinghead gas. *See Phillips*, 513 F.2d at 357. The plaintiff requested a rate increase, and in accordance with federal law, charged its customers the higher rate with the knowledge that it might have to return some or all of the increase in the event of an unfavorable decision. *See id.* at 359. Subsequently, the regulators approved part of the rate increase. The plaintiff then apportioned the suspended funds, returning some to the overcharged customers and preparing to return some to the producers who furnished gas under percentage-of-proceeds contracts. *See id.* While the rate increase proposal was pending, however, the defendants, the initial owners of an oil and gas lease, assigned "all right, title, and interest" in their lease and extraction equipment to a third-party purchaser. *See id.* at 357. Citing *Helvir*, the Fifth Circuit concluded the defendants were entitled to receive the suspense funds because they did not transfer their personal property rights in the unliquidated right to payment for the extracted gas. *See id.* at 364.

In *Brock*, in addition to assigning its right, title, and interest in oil and gas leases to the defendant, the plaintiff also assigned to the defendant all of its "agreements and contractual rights" relating to the leases as of a certain date. *See Brock*, 835 S.W.2d at 793. One of the contracts transferred was a "take-or-pay" gas contract the plaintiff had entered into with a third party. *See id.* Before the effective date of the assignment, the third party became obligated to pay $38,000 under the take-or-pay provision. *See id.* After the assignment transaction closed, the parties disputed whether the third party should make the accrued, but unpaid, "take-or-pay" payment to plaintiff or defendant. *See id.* Citing *Adams* and *Helvir*, the plaintiff argued the right to receive the take-or-pay claim was severed from the realty when it became due and, without an express transfer of personal property, did not pass to the defendant. *See id.* at 794–95. The defendant took the position that because the claim arose out of the gas contract, which expressly passed to the defendant on the effective date, it should be entitled to the payment. *See id.* In siding with the defendant, the court of appeals concluded *Helvir* and *Phillips* did not control the outcome of the litigation because, unlike the assignments in those cases, the *Brock* assignment conveyed contractual rights including the right to the take-or-pay claim. *See id.* at 795.

Appellants contend the decision in *Helvir*, as amplified and explained in *Phillips*, controls this case because the settlement proceeds are attributable in part to oil production that occurred before the assignment, and they did not assign to appellee their right to payment for oil already extracted from the ground. Appellants contend *Brock* is distinguishable because their assignment contained qualifications, and the take-or-pay claim at issue in *Brock* is a pure contractual right not based on

the actual production of oil. We do not find appellants' contentions persuasive.

In *Helvir* and *Phillips,* the parties understood unresolved issues existed regarding payment for the oil extracted. Much of the *Helvir* opinion is devoted to the decisive issue of the agent's authority to sell the oil runs. *See Helvir,* 82 S.W.2d at 394. In *Phillips,* the suspense funds were already in place. Thus, with the issue of payment for the past production already on the table, the parties in *Helvir* and *Phillips* signed agreements transferring only the leases without any mention of transferring contract rights. The fact that the overreaching agent in *Helvir* had to execute a side letter to the refiner underscores the point that no personal property was assigned.

■ Unlike *Helvir* and *Phillips,* the present assignment transferred more than leases and equipment. As in *Brock,* appellants assigned their contracts to appellee. Unless limited by exceptions, reservations, conditions, or restrictions, an assignment generally carries with it all rights, remedies, and benefits incidental to the property assigned. *Cadle Co. v. Estate of Weaver,* 897 S.W.2d 814, 818 (Tex.App.-Dallas 1994, writ denied).

Although appellants state in their reply brief that their "rights under operating agreements, product purchase and sale contracts and oil and gas leases were conveyed and passed on to [appellee] only with respect to proceeds for future production," such a qualification does not appear anywhere in the PSA or assignment. The PSA spells out in detail those items of personalty that are retained by appellants. In their brief, appellants cite to numerous sections of the PSA showing they retained the rights to certain personal property and rights arising before the effective date and the right to refunds and credits for undercharged expenses found in subsequent audits. Appellants contend these sections,

although not directly expressing that the right to pursue the class action litigation was retained, show the parties intended to reserve to appellants rights attributable to production prior to the effective time of the PSA. The fact the PSA contains detailed, lengthy descriptions of what rights appellants retained and how such rights were to be enforced discredits their interpretation that a right to pursue future litigation regarding underpayments was not transferred. Appellants concede that the class action litigation claim was unanticipated by the parties and thus is not covered in any of the provisions they cite. In his deposition, Kyle Burnett, appellee's chief executive officer, also stated he was unaware appellee would have claims for the oil underpayments. None of the provisions appellants cite alter the language in the PSA and assignment transferring appellants' contract rights to appellee.

■ If a written instrument is worded so that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and we will construe the contract as a matter of law. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). Except for those rights specially retained, appellants transferred everything to appellee, including the records of their own production. Nothing in the PSA or the assignment can be reasonably interpreted as retaining any contract claims for future litigation regarding disputed payments. To the contrary, the parties' agreement expressly assigns "[a]ll of [appellants'] right, title and interest in and to the oil, gas and mineral leases," "[a]ll of [appellants] right, title and interest in and to . . . all contracts, agreements (including without limitation all product purchase and sale contracts, farmout agreements, operating agreements and division orders, unit agreements, unit operating agreements and designations or declarations of pooled

units) ..." and "[a]ll of [appellants'] right, title and interest ... in and to all other leasehold interests, mineral interests, royalty interests, and overriding royalty interests in and to the Lands or the Leases or attributable to production therefrom...." By assigning all of their contracts and agreements to appellee, appellants, however unknowingly, assigned away their right to pursue litigation for disputed contractual underpayments. We must enforce the contract appellants entered; we cannot change it merely because they now dislike its provisions and think that something else is needed. *See Calpine Producer Serv. v. Wiser Oil Co.*, 169 S.W.3d 783, 789 (Tex.App.-Dallas 2005, no pet.).

Appellants' efforts to distinguish *Brock* are not persuasive. Appellants point out that there is a qualification on their assignment to appellee—paragraph 1.4 of the PSA provides the assignment is effective only as of August 1, 1994. Appellants ignore, however, that a similar effective date provision existed in the *Brock* assignment and the plaintiff in that case made a similar unavailing argument. *See Brock*, 835 S.W.2d at 793–95. The present contract assigns all of appellants' contractual rights to appellee effective August 1, 1994. Thus, even the qualification appellants rely on shows appellee owned their rights when the opportunity to participate in the class action arose in 1998.

We are similarly unmoved by appellants' contention that the take-or-pay contract claim in *Brock* is dissimilar to the present case because it did not involve the extraction of oil from the ground. The critical issue appellants overlook is that this case is not about what was produced, but rather about what was assigned. *Helvir* and *Phillips* involve assignments only of leases and disputes about payments for oil. *Brock* and the present case involve assignments not only of leases, but also of associ-

ated contracts and payments arising under those assigned contracts.

■ Appellants assert the settlement agreements expressly refer to the settlement proceeds as payments for barrels of oil. A review of the settlement agreements does not support appellants' interpretation. Although the litigation arose from inadequate "per barrel valuations" and the proceeds of the first settlement were apportioned between the class members on the basis of number of barrels of oil produced, the agreements expressly disavow that the settlement represents payments for oil. The first settlement agreement with the non-appealing class members represents the defendants "deny each of the claims alleged and are prepared to defend these actions vigorously. Nevertheless, Settling Defendants desire to effectuate the settlement provided for in this Settlement Agreement in order to avoid the further expenses and burden of protracted litigation and to put to rest further controversy." The agreement further states it "takes into consideration the expense of further proceedings, the strengths and weaknesses of the claims against Settling Defendants, the defenses thereto, and such other factors as are appropriate in evaluating the matter." Paragraph 5 of the first settlement agreement provides as follows:

5. NO ADMISSION OF LIABILITY

The settlement embodied in this Settlement Agreement is made to compromise and settle the Settlement Class Claims without further litigation. It is not, and it should not be interpreted as, an admission of any liability or wrongdoing by Settling Defendants, nor should it be construed as an admission of any strength or weakness in the Class Claims against Settling Defendants. Settling Defendants deny any wrongdoing or liability. No statement appearing

in the Plan of Allocation or any other Exhibit to this Agreement is, or should be interpreted as, an admission by any Settling Defendant.

Similarly, the second settlement agreement recites it is entered "in consideration of the mutual obligations herein undertaken," that the defendants would pay $8,425,000 in exchange for dismissal of the appeal, and that it "is a settlement of disputed matters and is contractual in nature...." Even more difficult for appellants, the second settlement agreement does not even purport to be based upon volume of production of barrels of oil.

To counter the unambiguous language of the settlement agreements, appellants point to deposition testimony showing Joe Vaughn, president of the general partner of one of the appealing class members, and Burnett appealed the global settlement because they wanted extra compensation for barrels of oil. Appellants contend the testimony shows the settlements were thus additional payments for extracted oil.

■ Settlement agreements are interpreted under the same rules as contracts. *See Cities of Abilene v. Pub. Util. Comm'n of Tex.*, 146 S.W.3d 742, 747 (Tex.App.-Austin 2004, no pet.). If a contract can be given a certain or definite meaning or interpretation, then we construe the unambiguous contract as a matter of law. *Jacobson v. DP Partners, Ltd. P'ship*, 245 S.W.3d 102, 106 (Tex.App.-Dallas 2008, no pet.). Whether a contract is ambiguous is a question of law determinable by reviewing the whole contract in light of the circumstances present when it was entered. *Id.* Parol evidence is inadmissible to create an ambiguity in a contract that, on its face, is unambiguous. *Id.* Because the settlement agreements unambiguously recite the consideration and intent of the parties, we cannot agree with appellant that parol evidence of any kind raises a genuine issue of material fact regarding the settlements.

Thus, Vaughn's and Burnett's testimony does not affect our construction of the settlement agreements at issue. *See id.* at 106–07. We overrule appellants' first issue.

In their second issue, appellants contend the trial court erred in granting summary judgment because they raised genuine issues of material fact. First, appellants contend there are factual issues regarding whether the second settlement, and the "additional payment" check generated from that settlement, was part of the larger settlement or was, as appellee contends, a wholly separate matter. As we have already described, the record shows appellee received the second settlement check as consideration for withdrawing its appeal. The second settlement agreement provides the settlement was contingent upon dismissal of all appeals and finalization of the overall global settlement in the class action by October 18, 2001.

Because the settlement agreement is conditioned upon the finalization of the global settlement, we agree with appellants that the settlement of the appeal was not an entirely separate matter from the settlement of the class action. It does not follow, however, that the linkage appellants seek to exploit creates a genuine issue of material fact. The second settlement agreement straightforwardly describes the consideration the defendants were prepared to pay to put all litigation behind them. The first settlement was final as to appellants and the nonappealing class members. Appellants do not show how the fact that defendants were prepared to pay a substantial amount of money to the appealing class members to put the litigation behind them creates a genuine issue of material fact that somehow appellants, who chose not to appeal, are entitled to share in the bounty.

Appellants next contend appellee's summary judgment evidence raises genuine issues of material fact regarding the nature and purpose of the class action and appeal and that part of the settlement agreement attributable to production of oil occurring before the effective time. Appellants identify the evidence creating the fact issues as the notice of class action and proposed settlement, the parties' claims filed in the class action, various pages of the Vaughn and Burnett depositions, an affidavit, and the second settlement agreement with attached payout statement.

Appellants do not expressly state what disputed facts they contend arise from the cited pages. An examination of the pages appellants cite does not reveal any genuine issues of material fact. The notice, deposition excerpts, and affidavit establish no more than the class action lawsuit and the resulting appeal involved claims that the defendants had underpaid the class members for oil production. The underlying nature of the lawsuit is not in dispute. Rather, resolution of this case turns upon a determination of the nature of the settlements reached and the interests assigned by appellants to appellee. The second settlement agreement, on its face, does not contain any language that would entitle appellants, who are not parties to the agreement, to share in the settlement proceeds. The attached payment statement shows what each appealing class member would receive in the first settlement agreement, in addition to the "additional payment" provided by the second settlement. None of the pages appellants cite raises any disputed fact issues.

■ Finally, appellants contend a genuine issue of material fact exists regarding whether appellee was representing appellants' interests in the appeal. To support their contention, appellants cite to two pages from the deposition of Charles Hinton, Jr., president of Hinton Production Company. Hinton testified as follows:

[Counsel]: Why did [appellants] not appeal the order and final judgment out of the U.S. District court in Corpus Christi?

[Witness]: It was being appealed by [appellee] and they were appealing for the same barrels. And [appellee] had the information, we didn't, and so we relied on [appellee] to carry the appeal.

[Counsel]: Did you ever have any discussions with anyone at [appellee] at that time where [appellee] said that they were bringing the appeal in any way on behalf of Hinton or any Hinton party?

[Witness]: I don't recall.

[Counsel]: You don't recall or did it not?

[Witness]: I don't recall—I don't recall any conversations with [appellee] and I don't know if my father did....

[Counsel]: Okay. Did—did Hinton ever notify anyone that Hinton was—the Hinton group was not going to appeal?

[Witness]: I don't remember.

Appellants contend Hinton's testimony, coupled with a letter from the parties' joint counsel offering to settle the appeal on behalf of appellee and all the parties for whom appellee was acting in a fiduciary or representative capacity, raises a fact issue regarding whether appellee represented appellants' interests when it appealed the settlement.

■ Initially, we note that appellants' position directly contradicts their own pleadings which state categorically that they did not appeal the class settlement. Likewise, appellants' position is at odds with evidence showing they filed and settled their own claim with defendants. Although Hinton asserts appellee was rep-

resenting appellants' interests, he cannot recall ever discussing such representation with appellee. No evidence in the record shows appellee agreed to represent appellants' interest or knew that appellants intended to rely upon appellee to represent them in the appeal. Burnett denied bringing the appeal on behalf of any parties other than appellee. An agency relationship necessarily requires the consent of both the principal and the agent. *See Crooks v. Moses,* 138 S.W.3d 629, 637 (Tex.App.-Dallas 2004, no pet.) (defining agency).

Regarding counsel's letter, we observe that the "parties for whom [appellee] acts in a fiduciary or representative capacity" are described within the same paragraph of the letter as "all of the trusts, estates and other entities for which [appellee] has filed its claims with the Settlement Administrator." It is undisputed that appellants and appellee filed separate claims and appellants settled their claim and gave the defendants a full release. Nothing in the second settlement agreement would justify treating appellants as third-party beneficiaries of the agreement. *See MCI Telecomm. Corp. v. Tex. Util. Elec. Co.,* 995 S.W.2d 647, 651 (Tex.1999) (discussing requirements to qualify as third-party beneficiary under contract). Thus, we conclude no evidence in the record raises a genuine issue of material fact regarding whether appellee represented appellants in its appeal of the class settlement. We overrule appellants' second issue.

In their third issue, appellants contend the trial court erred by ignoring their equitable causes of action for money had and received and an accounting of the funds appellee received in its settlement. The trial court granted summary judgment and expressly concluded appellants had assigned all their rights to pursue further payment to appellee. Appellants' equitable claims all presuppose that they re-tained their rights to sue for the underpayment and, thus, appellee had wrongfully withheld the second settlement proceeds from them. Because we have already concluded the trial court's determination that the contract rights were fully assigned is correct, we need not further address appellants' third issue. *See* TEX.R.APP. P. 47.1 (opinion must address issues necessary for final disposition of appeal). It is overruled.

In their fourth issue, appellants contend their claims were not barred by limitations as appellee had urged in its motion for summary judgment. As appellants relate, the trial court did not address specifically the limitations ground in its order. Having already determined that the trial court did not err in granting summary judgment on the ground appellants assigned their rights at issue to appellee in the 1994 assignment, appellants' fourth issue is moot. *See Ware v. Everest Group, L.L.C.,* 238 S.W.3d 855, 861 (Tex.App.-Dallas 2007, pet. denied) (appellate court may affirm summary judgment granted on specific meritorious ground).

We affirm the trial court's judgment.