**AFFIRMED; Opinion Filed December 3, 2013.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-12-00822-CV

**MILLER GLOBAL PROPERTIES, LLC, MILLER GLOBAL FUND V, LLC,
SA REAL ESTATE LLLP, AND SA RESORT LLLP, Appellants
V.
MARRIOTT INTERNATIONAL, INC. AND
MARRIOTT HOTEL SERVICES, INC., Appellees**

**On Appeal from the 219th Judicial District Court
Collin County, Texas
Trial Court Cause No. 219-03327-2009**

## OPINION

Before Justices O'Neill, Francis, and Evans
Opinion by Justice Evans

This is an appeal from a summary judgment granted in favor of Marriott International, Inc. and Marriott Hotel Services, Inc. (collectively "Marriott."). Miller Global Properties, LLC, Miller Global Fund V, LLC, SA Real Estate LLLP, and SA Resort LLLP (collectively "Miller"), bring five issues contending the trial court erred in dismissing their claims for fraudulent inducement, negligent misrepresentation, professional negligence, and contractual indemnification on the grounds asserted by Marriott. Because we conclude the contracts between the parties disprove reliance as a matter of law on the alleged misrepresentations made the basis of Miller's claims, we affirm the trial court's judgment.

**FACTUAL BACKGROUND**

This case concerns the development and sale of the JW Marriott San Antonio Hill Country Resort and Spa and the TPC San Antonio golf club (the "Resort"). Marriott began the initial stages of developing the Resort in 2001. In 2005, Marriott and Miller began discussions regarding Miller's investment in the project. Miller is a real estate investment company specializing in the development, acquisition, redevelopment, and disposition of high end office and hotel properties. Marriott's and Miller's discussions resulted in a series of agreements by which Miller ultimately assumed ownership of the Resort and Marriott agreed to manage it.

On April 11, 2006, the parties signed a letter of intent. The letter outlined the project and the future contracts under which the Resort would be developed. The parties agreed that they would jointly refine the estimate of total costs for the resort based on the conceptual drawings that had been delivered. The parties further agreed that, in future phases of the development, they would work together to finalize the drawings for the Resort and the associated cost budgets.

On October 31, 2006, the parties signed an Amended and Restated Pre-Development Agreement. Under this agreement, all major decisions were to be made by the parties jointly. Major decisions included "[f]inalization of the program and design for the Resort . . . to achieve a Design Development Budget not to exceed $435,000,000." The agreement also stated that "[t]he parties shall use best and prompt efforts to agree on and finalize the Design Development Budget and the Project Drawings and Specifications."

Between October 2006 and July 2007, Marriott and Miller continued negotiations regarding the final terms of Miller's purchase of the property and the related transactions. The target budget was raised to $467,000,000. On May 2, 2007, Marriott provided Miller with a document entitled "Potential Road Map Suggestions to Attain the Project Target Budget." This document showed a probable cost for the project of $484,141,000. The document went on to

propose potential cost savings to reduce the projected costs by $19,955,000. Among the proposed savings was reducing the 5% "construction contingency" portion of the budget to 4% because, according to Marriott, "essentially 100% construction drawings do not require a construction contingency of 5%." Miller alleges that, throughout the negotiations, Marriott made "firm and specific representations" regarding "the sufficiency of the budget to construct, furnish, and equip the Resort" and "the completeness of the plans and specifications for the construction of the Resort."

On July 31, 2007 the parties executed interrelated agreements pursuant to which Miller acquired the unfinished Resort. The first agreement was the Purchase Agreement. This agreement contained an "As-Is Sale" provision which stated:

> Except as otherwise expressly provided for in this Agreement, [Miller] acknowledges and agrees that Marriott and Marriott Rewards have not made, do not make and *specifically negate and disclaim any representations,* warranties, promises, covenants, agreement or guaranties of any kind or character whatsoever, either express or implied, oral or written, past, present or future, of, as to, or concerning or with respect to the Property or the transactions contemplated by this Agreement.

(emphasis added).

The next agreement was the Management Agreement by which Miller hired Marriott to manage and operate the Resort. Under this contract, Miller agreed to "build the Resort in accordance with the Addendum attached hereto" and both Miller and Marriott agreed that "their rights and obligations under the [Management] Agreement with respect to the construction and pre-opening stages of the Hotel shall be governed by the Addendum." The Management Agreement further stated that Miller and Marriott "are both business entities having substantial experience with the subject matter of this Agreement, and each has fully participated in the negotiation and drafting of this Agreement," and that Miller had "special expertise in the development and management of hotel properties" and "will substantially participate directly in

the development, construction and operation of the Hotel." Finally, the Management Agreement included a "merger clause" stating that

> [t]his Agreement, together with any other writings signed by the parties expressly stated to be supplemental hereto and together with any instruments to be executed and delivered pursuant to this Agreement, constitutes the entire agreement between the parties and supersedes all prior understandings and writings.

The Addendum referenced by the Management Agreement was the Technical Services and Pre-Commencement Addendum ("TSA"). Schedule 1 of the TSA was the Resort's "Approved Plans." The TSA recited that both Miller and Marriott have "agreed upon the Approved Plans for the construction of the Resort," and one of the requirements for substantial completion of the Resort was "conformance, in all material respects, with the Approved Plans." Miller also agreed that "construction, furnishing and equipping of the Resort shall be completed in accordance with the Approved Plans, the Approved Variances, the Approved [Items] and System Standards."

Schedule 4 of the TSA was a list of "Unapproved Elements" related to the construction plans. The list was twenty-one pages long and outlined approximately two hundred elements of the Resort plans that had not yet been submitted or approved. The list included such unfinished elements as "[n]o details have been provided for the children's pool" and states that Miller must "[p]rovide plans, elevations, and details." Other unfinished elements include "[n]o finishes, plans, or millwork details for the Administrative areas," the need for "plans, elevations, finishes, millwork drawings and details" for all "out buildings," and the requirement that Miller "[c]omplete the design of the golf course buildings and maintenance buildings including plans, elevations, finishes, millwork drawings, and details." The TSA stated that Miller was to submit to Marriott for review and approval the "plans, specifications, construction drawings and such other renderings, documents and materials that are reasonably necessary, in [Marriott's] opinion,

–4–

to adequately explain the construction, design intent, quality, and location, as applicable, of the respective Unapproved Element."

Schedule 7 of the TSA was two pages of "Submittals" to be provided by Miller for Marriott's review and approval. The Submittals included shop drawings, product data, and samples for multiple aspects of the Resort's construction including "major mechanical equipment & controls," security and fire protection systems, telecommunications systems, roofing, and exterior and interior finish materials. Upon Marriott's approval, the Submittals would become part of the Approved Plans. The agreement specified, however, that it was "understood and agreed that [Marriott was] providing no construction management services and that construction management [would] be the sole responsibility of [Miller]. It was further agreed that Marriott's "approval of plans, specifications, budgets, and/or changes" did not imply and could not be deemed to constitute an opinion by Marriott regarding the design or construction of the Resort including the "adequacy of any budgets."

The possibility of increased costs and the costs associated with changing the Approved Plans were included in several sections the TSA. Section 4.1.1 states that "[e]xcept as set forth in Section 2.3.3, [Miller] shall be solely responsible for any cost over-runs arising from the design, construction, equipping or furnishing the Resort." Section 2.3.3 required Marriott to pay for the implementation of necessary changes to the Approved Plans caused by Marriott's or its affiliate's gross negligence or willful misconduct. The section also required both Miller and Marriott to pay certain incremental costs associated with changes to the Approved Plans except that Miller was solely responsible for the cost of changes related to "Life Safety Standards," that were necessitated by errors or omissions in the plans not attributable to the gross negligence or willful misconduct of Marriott or its affiliates, or were changes approved by Miller that were shown to be reasonably expected to produce a certain increase in the Resort's profit. Under

–5–

section 3.03 of the Management Agreement, if there was an increase in the cost of the project, Miller was entitled to request a larger share of the Resort's initial operating profits.

A little over one year later, Miller contends it discovered that the total cost to build the Resort would be approximately $90,000,000 more than the target budget. According to Miller, the additional expenses did not arise until months after the acquisition closed. On September 1, 2009, Miller filed this suit alleging claims for breach of the Management Agreement, negligent misrepresentation, fraudulent inducement, professional negligence, and contractual indemnification. Specifically, Miller alleged that Marriott misrepresented that the plans and specifications for the Resort were essentially complete and that the target budget would be adequate to complete construction. Miller contended that it relied on those representations when it decided to go forward with the acquisition of the Resort. Marriott filed two motions for partial summary judgment contending, among other things, that Miller's tort claims failed as a matter of law because the Management Agreement and the TSA negated the element of reliance on the alleged misrepresentations. The trial court granted Marriott's motions and dismissed all of Miller's claims except its claim for breach of contract and the corresponding claim for attorney's fees.

After the trial court signed its orders, the Texas Supreme Court issued its opinion in *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of America*, 341 S.W.3d 323 (Tex. 2011). In *Italian Cowboy*, the court addressed the sufficiency of contractual language to negate the element of reliance. Based on this holding, Miller moved the trial court for reconsideration of its orders dismissing its tort claims. Marriott responded and submitted additional evidence in support of its motions, including the Purchase Agreement. After reviewing the motion and response, the trial court denied the motion to reconsider. Miller later non-suited its contractual claims making the trial court's orders final. This appeal ensued.

**ANALYSIS**

Miller brings five issues on appeal generally contending the trial court erred in granting Marriott's motions for summary judgment. In its first two issues, Miller contends the court erred in concluding that the provisions of the contracts between the parties negated the element of reliance. Marriott responds that, because the contracts contradict the alleged representations upon which Miller states it relied, and Marriott disclaimed any representations made outside the agreements, Miller cannot show reliance on the alleged representations as a matter of law. We agree.

## I. FRAUDULENT INDUCEMENT AND NEGLIGENT MISREPRESENTATION

Causes of action for fraudulent inducement and negligent misrepresentation require proof of reliance. *See Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001); *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991); *see also Johnson & Johnson Med., Inc. v. Sanchez*, 924 S.W.2d 925, 929–30 (Tex. 1996). The plaintiff must have both actually and *justifiably* relied on the alleged misrepresentation to suffer a compensable injury. *DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (en banc) (op. on reh'g). A party to an arms-length transaction must exercise ordinary care and reasonable diligence for the protection of its own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party. *Id*. To vitiate a contract, the alleged fraud must be something more than oral representations that conflict with the terms of the written contract. *See Athey v. Mortg. Elec. Registration Sys., Inc.*, 314 S.W.3d 161, 165 (Tex. App.—Eastland 2010, pet. denied). A party that enters into a written contract while relying on a contrary oral agreement does so at its peril and is not rewarded with a claim for fraudulent inducement. *See DRC*, 112 S.W.3d at 859. Where a contract between the parties directly contradicts the alleged misrepresentations, there can be no justifiable reliance.

–7–

*See Simpson v. Woodbridge Props., L.L.C.*, 153 S.W.3d 682, 684 (Tex. App.—Dallas 2005, no pet.).

In this case, the two alleged misrepresentations Miller claims it relied upon were that, at the time it acquired the Resort, the construction plans were essentially complete and the target budget was sufficient to complete construction. The subject matter of these representations is specifically dealt with at significant length in the contracts between the parties and, to the extent the representations may have been false, they are directly contradicted by the contracts' terms.

With respect to the completeness of the construction plans, Miller agreed in both the letter of intent and the predevelopment agreement that it would work jointly with Marriott to finalize the drawings and design for the Resort. The resulting "Approved Plans" were then attached as Schedule 1 to the TSA. The TSA specifically states that both Miller and Marriott agreed upon the Approved Plans and that the resort would be built in accordance with those plans. This demonstrates that, at the very least, Miller was given access to the plans before it signed the contracts, and had both the opportunity and the responsibility to assess the plans before agreeing to them and moving forward with the acquisition.

In addition, although Marriott opined in several communications with Miller before the contracts were signed that it believed the plans were essentially complete, Schedules 4 and 7 of the TSA identified hundreds of required construction elements and specifics that were not in the plans. Miller characterizes the unapproved elements solely as "changes" Marriott wished to make to the Approved Plans. Because Miller asserts the schedules showed only proposed changes, it argues they did not conflict with Marriott's representation that the plans were essentially complete. A review of the schedules, however, shows that a substantial number of the unapproved elements were not proposed changes to the plans, but were elements for which original plans or specifications did not yet exist. These additional needed elements ranged from

plans for the children's pool to major systems and components such as boilers, chillers, cooling towers, air handlers, a fire protection system, security system, and telecommunications system. Given that Miller (1) agreed to joint responsibility for developing the construction plans, (2) had the opportunity to review the plans before signing the contracts, (3) agreed to the plans that were made a part of the contracts, and (4) was given a substantial list of the ways in which the plans were incomplete, Miller could not justifiably rely as a matter of law on any representations by Marriott regarding the status of the plans.

As for Marriott's alleged representation that the target budget would be sufficient to finish construction of the Resort, the potential for costs to exceed the budget, and who was liable for those costs, was addressed at length in the Management Agreement and the TSA. By claiming fraudulent inducement, Miller is attempting to negate the effect of those provisions.

As stated above, the schedules made part of the TSA demonstrated that the construction plans required extensive additions at the time the contracts were signed. Miller specifically agreed in the TSA that Marriott would not be responsible for determining the adequacy of the budget to cover the additions and changes made after closing. If, as Miller asserts, it was relying on Marriott's alleged guaranty that the target budget was sufficient to complete construction, including covering the costs of the additions and changes, then the provisions addressing liability for cost overruns, responsibility for added costs associated with additions and changes, and the ability of Miller to increase its share of the initial profits based on increased costs would be entirely superfluous. Miller was jointly responsible with Marriott for establishing the target budget. Miller cannot agree to jointly create a budget, sign a contract including extensive provisions addressing the eventuality of exceeding that budget, and then contend it was misled when the budget is exceeded.

As part of its summary judgment evidence, Miller submitted the affidavit of its president, James Miller, stating that nothing in the contracts was intended to waive Miller's reliance on Marriott's representations regarding the plans and the budget. Specifically, Miller testified that his company would not have gone forward with purchasing the Resort if Marriott had included a provision in the contracts specifically disclaiming or denying its pre-closing representations. Yet, the Purchase Agreement contained an "as-is sale" clause doing exactly this. Pursuant to the as-is sale provision, Marriott specifically "negate[d] and disclaim[ed]" any previous "representations, warranties, promises, covenants, agreement or guaranties of any kind" with respect to the Resort or the transactions. An "as-is" provision, freely negotiated by similarly sophisticated parties as part of the bargain in an arm's length transaction, generally should be given effect. *See Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 162 (Tex. 1995).

Miller contends there are fact issues regarding whether the parties are similarly sophisticated and whether the provisions at issue were negotiated or merely boilerplate. In support of this argument, Miller presented the testimony of its president stating that the company had no previous experience developing a Marriott resort. But, as Marriott noted in its motion for summary judgment, Miller is a real estate investment company with over $1 billion in assets that specializes in the development of hotels and offices. Furthermore, Miller explicitly agreed in the Management Agreement that it had "substantial experience" and "special expertise" in the development and management of hotel properties and that it had fully participated in the negotiation and drafting of the agreement. Although Miller's president stated that the company never intended anything in the contracts to release Marriott from liability for its pre-acquisition representations, Miller did not dispute the evidence that it fully negotiated the contract provisions relating to the construction plans and the budget.

Miller relies on the Texas Supreme Court opinion in *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, (Tex. 2011) for the proposition that the as-is provision does not evidence an intent by Miller to disclaim its reliance on the alleged misrepresentations or waive any claims for fraudulent inducement. In *Italian Cowboy*, the supreme court stressed that, to contractually disclaim reliance, parties must use clear and unequivocal language. *Id*. at 336. The purported disclaimer provisions in *Italian Cowboy* included language by which the plaintiffs acknowledged that the defendants had not made any representations or promises about the contract's subject matter except as expressly set forth in the contract. *Id*. at 328. In concluding that this language did not disprove reliance on false statements made outside the scope of the contract, the court explained that "there is a significant difference between a party disclaiming its *reliance* on certain representations, and therefore potentially relinquishing the right to pursue any claim for which reliance is an element, and disclaiming the *fact* that no other representations were made." *Id*. at 335. However, both the disclaimer language and the contract as a whole at issue in *Italian Cowboy* differ in material ways from the contracts presented in this case.

Unlike the provision in *Italian Cowboy* which simply stated that no outside representations or promises had been made, the as-is provision in the Purchase Agreement specifically *negated* and *disclaimed* all outside representations, warranties, promises, covenants, agreements or guarantees made by Marriott whether express or implied, oral or written. More importantly, the contract at issue in *Italian Cowboy* did not address the subject matter made the focus of the dispute and nothing in the agreement contradicted the alleged misrepresentation. Because of this, the court in *Italian Cowboy* focused solely on whether reliance had been disclaimed, and not on whether reliance was justified. In contrast, as discussed above, the contracts between Miller and Marriott dealt thoroughly with the specific subjects made central to

–11–

the conflict between the parties and the provisions to which Miller agreed contradicted the alleged misrepresentations it claims to have relied on. When a party signs a contract that directly contradicts alleged misrepresentations and affirmatively disclaims any promises or representations other than those made in the contract, the party cannot justifiably rely on alleged extra-contractual misrepresentations as a matter of law. *See Dresser–Rand Co. v. Bolick*, No. 14-12-00192-CV, 2013 WL 3770950 at *9 (Tex. App.—Houston [14th Dist.] July 18, 2013, pet. filed); *Blackmon–Dunda v. Mary Kay, Inc.*, 05-08-00192-CV, 2009 WL 866214 at *4 (Tex. App.—Dallas April 1, 2009, pet. denied); *Simpson*, 153 S.W.3d at 684.

## II. PROFESSIONAL NEGLIGENCE

Miller next argues that, even if the summary judgment evidence disproves reliance, the trial court erred in dismissing its claim for professional negligence because reliance is not an element of that cause of action. Marriott responds that, although reliance is not a necessary element of a professional negligence claim, Miller must be able to show it suffered an injury proximately caused by Marriott's alleged negligence. In this case, absent reliance on the purported misrepresentations, Miller cannot show that Marriott proximately caused any of its alleged injuries.

Professional negligence requires a showing of proximate cause. *See Palmer v. Espey Huston & Assocs., Inc.*, 84 S.W.3d 345, 354 (Tex. App.—Corpus Christi 2002, pet. denied). Proximate cause, in turn, requires proof of two things: foreseeability and cause in fact. *See F.D.I.C. v. Ernst & Young*, 967 F.2d 166, 170 (5th Cir. 1992). For there to be cause in fact, the act or omission must be a substantial factor in bringing about the injury such that without it no harm would have occurred. *Id.*

Miller asserts that Marriott was "professionally negligent in overseeing the creation of the budget and plans for the Resort." Miller further assets that, but for Marriott's representations

regarding the budget and plans, it would not have gone forward with the purchase. It is clear from Miller's allegations that reliance is critical to the injuries it claims. It is only through its alleged reliance on Marriott's representations that Miller could have been injured by Marriott's involvement in the creation of the budget and plans. Because reliance is a critical component to the causation element of Miller's professional negligence claim, we conclude the absence of justifiable reliance in this case is equally fatal to this claim as to Miller's other tort claims. *Id*. We resolve Miller's first two issues against it

## III. CONTRACTUAL INDEMNIFICATION

In its fifth issue, Miller contends the trial court erred in granting summary judgment on its claim for contractual indemnification. Miller asserted the claim based on section 5.3(b) of the Pre-Development Agreement which provided:

> If either party acts outside the scope of its authority, or otherwise is guilty of fraud or willful misconduct in connection with the activities contemplated by this Agreement (collectively, the "Prohibited Acts"), the party committing such Prohibited Acts shall indemnify, defend, and hold harmless the other party from and against any and all costs, liabilities, expenses and claims, including but not limited to, reasonable attorney's fees (collectively, "Losses") arising, directly or indirectly, from such Prohibited Acts.

In its petition, Miller requested relief under this provision alleging that Marriott "acted outside the scope of its authority" and "engaged in fraudulent and/or willful misconduct . . . by intentionally misrepresenting to Miller Global the adequacy and completeness of the plans and specifications for the Resort and the sufficiency of the project budget." Miller further asserted that "as a direct and proximate result of Marriott Int'l's fraudulent and/or willful misconduct, Miller Global suffered injuries and seeks damages . . . on claims for contractual indemnification." Marriott moved for, and was granted summary judgment on the indemnity claim on the ground that the failure of Miller's tort claims precluded any relief under the indemnity clause.

–13–

An indemnity agreement is a promise to safeguard or hold the indemnitee harmless against existing and/or future loss liability. *See Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993). The indemnity clause at issue provides indemnification for losses "arising, directly or indirectly, from . . . Prohibited Acts." Even assuming that the indemnity clause at issue applies to claims for losses suffered by Miller,[1] Miller cannot show that the alleged "prohibited acts" caused its asserted losses. The only prohibited acts Miller alleged were the purported misrepresentations. As discussed above, the alleged misrepresentations did not cause Miller any injury as a matter of law because Miller could not have justifiably relied upon them. Accordingly, Miller's losses did not arise, directly or indirectly, from the only prohibited acts made the basis of the indemnification claim. Miller cannot use a contractual indemnity provision to circumvent both its inability to show justifiable reliance on Marriott's alleged misrepresentations and its contractual obligations to pay for cost overruns. We resolve Miller's fifth issue against it.

Because we have resolved Miller's first, second, and fifth issues against it, it is unnecessary for us to address Miller's third and fourth issues.

---

[1] An indemnity provision does not apply to claims between the parties to an agreement, but rather obligates the indemnitor to protect the indemnitee against claims brought by persons not a party to the provision. *See Derr Constr. Co. v. City of Houston*, 846 s.w.2d 854, 858 (Tex. App.—Houston [14th Dist.] 1992, no writ).

**CONCLUSION**

Based on the foregoing we conclude the trial court correctly granted summary judgment on Miller's claims for fraudulent inducement, negligent misrepresentation, professional negligence, and contractual indemnification.  We affirm the trial court's judgment.


/David Evans/
DAVID EVANS
JUSTICE

120822F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

MILLER GLOBAL PROPERTIES, LLC, MILLER GLOBAL FUND V, LLC, SA REAL ESTATE LLLP, AND SA RESORT LLLP, Appellants

No. 05-12-00822-CV    V.

MARRIOTT INTERNATIONAL, INC. AND MARRIOTT HOTEL SERVICES, INC., Appellees

On Appeal from the 219th Judicial District Court, Collin County, Texas
Trial Court Cause No. 219-03327-2009.
Opinion delivered by Justice Evans.
Justices O'Neill and Francis participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees MARRIOTT INTERNATIONAL, INC. AND MARRIOTT HOTEL SERVICES, INC. recover their costs of this appeal from appellants MILLER GLOBAL PROPERTIES, LLC, MILLER GLOBAL FUND V, LLC, SA REAL ESTATE LLLP, AND SA RESORT LLLP.

Judgment entered this 3rd day of December, 2013.

/David Evans/
DAVID EVANS
JUSTICE