**AFFIRM in Part, REVERSE in Part, and REMAND; Opinion Filed August 11, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-13-01700-CV**

**ORCA ASSETS, G.P., L.L.C., Appellant**
**V.**
**JPMORGAN CHASE BANK, N.A.,**
**JPMORGAN CHASE BANK, N.A., TRUSTEE OF THE RED CREST TRUST,**
**AND PHILIP METTHAM, Appellees**

**On Appeal from the 44th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-12-05303**

## MEMORANDUM OPINION

Before Justices Bridges, Lang, and Schenck
Opinion by Justice Schenck

Appellees JPMorgan Chase Bank, N.A., JPMorgan Chase Bank, N.A., Trustee of the Red Crest Trust, and Philip Mettham ("JPMorgan") leased oil and gas properties to appellant Orca Assets, G.P., L.L.C. ("Orca"). But JPMorgan had already leased the same properties to GeoSouthern Energy Corporation, an unrelated third party, some six months before. Orca sued, alleging fraud, negligent misrepresentation, and breach of contract. After a hearing under rule 166, Texas Rules of Civil Procedure, the trial court rendered judgment for JPMorgan. Because JPMorgan was not entitled to judgment as a matter of law on Orca's fraud and negligent misrepresentation claims, we reverse the trial court's judgment and remand the cause as to those claims. We affirm the trial court's judgment on Orca's claims for breach of contract.

BACKGROUND

In June, 2010, JPMorgan leased the mineral rights to acreage in DeWitt County, Texas to GeoSouthern.[1] Around the same time, Orca identified the same acreage for potential acquisition as part of a strategy to "pursue unconventional drilling opportunities in the Eagle Ford Shale play." The acreage in question was owned by the Red Crest Trust, and Orca was familiar with the title issues that arose concerning oil and gas properties purchased by H. J. McMullen, the original purchaser of the Red Crest Trust properties. Orca describes McMullen as "a colorful figure in Texas oil and gas history," and cites numerous fraud cases litigated in Texas in the 1960s over McMullen's interests. Knowing of the potential title issues, but wanting to join the Eagle Ford "land rush," Orca opened an office in DeWitt County and moved landmen there to check property records at the courthouse, as well as hiring two shifts of local residents to operate a phone bank. The landmen identified potential acreage, and the phone bank workers called the surface estate owners to inquire about any leasing activity on the properties.

In November, 2010, Orca met with representatives of JPMorgan to discuss leasing the mineral rights to the same property that JPMorgan had already leased to GeoSouthern. Orca contends and offered summary judgment evidence[2] that Mettham represented at the meeting the acreage in question was "open" for lease.

On December 6, 2010, the parties signed a letter of intent for the property, for which Orca paid consideration of $84,028.50. This letter provided in relevant part:

> 1.      Orca has caused a search to be made in the records of Karnes and DeWitt Counties and has preliminarily determined that Red Crest Trust is the owner and

---

[1] The ensuing dispute between Orca and GeoSouthern is a separate lawsuit. *Orca Assets, G.P., L.L.C. v. Burlington Res. Oil & Gas Co.*, No. 13-13-00462-CV, 2015 WL 233670 (Tex. App.—Corpus Christi, Jan. 15, 2015, pet. filed). Orca has filed a petition for review of the court of appeals' conclusion that GeoSouthern's title and rights to the properties were superior to Orca's. *Orca Assets, G.P., L.L.C. v. Burlington Res. Oil & Gas Co., L.P.*, No. 15-0161 (Tex., pet. filed Apr. 9, 2015). GeoSouthern is not a party here.

[2] At the time of the Rule 166 hearing, the parties had conducted discovery and had moved for summary judgment, so that the record contained summary judgment evidence submitted by both appellant and appellees. The record reflects that the trial court denied Orca's motion for partial summary judgment. There is no separate ruling on appellees' motion for summary judgment in the record.

holder of the mineral estate underlying the following lands [descriptions omitted] which lands ORCA has further determined to be free of any recorded oil and gas lease heretofore executed [by] the rightful owner thereof; . . . .

Paragraph 2 of the letter of intent recited that Orca had offered consideration for leases covering the property described. The leases were to use the same form as a specific previous lease between the parties, except for a new paragraph 18 required by Mettham on behalf of JPMorgan. This new paragraph 18 is quoted in full in the letter of intent:

> 18. Negation of Warranty. This lease is made without warranties of any kind, either express or implied, and without recourse against Lessor in the event of a failure of title, not even for the return of the bonus consideration paid for the granting of the lease or for any rental, royalty, shut-in payment, or any other payment now or hereafter made by Lessee to Lessor under the terms of this lease.

Paragraph 3 of the letter of intent recited that "Orca has accepted the counteroffer of [JPMorgan] proposing to modify paragraph 18." Paragraph 3 also explained that "in light of such requested modification," the parties agreed to a delay in closing the transaction for up to thirty days "to allow ORCA the opportunity to re-examine its title work upon which its determination of ownership is based." Paragraph 4 permitted Orca to close the transaction "on a piecemeal basis, that is to say, as the title to the individual tracts is examined and approved." Also under paragraph 4, Orca could elect not to take a lease on a particular tract "[i]n the event that such re-examination of title should reveal information to Orca heretofore unknown to it about one or more tracts above described that brings into question the ownership of [JPMorgan] therein." Paragraph 5 provided that during the term of the letter agreement, JPMorgan "shall not grant any oil, gas and mineral lease or leases to another party or parties covering the above described land" or grant an option to another party to acquire any mineral lease affecting the land.

After the letter of intent was signed, Orca undertook to review the title work it had already conducted on the property in question. That is to say, Orca retained counsel to closely examine the title history revealed by its examination prior to the November 2010 meeting and

–3–

resulting letter of intent. Orca did not, however, conduct any new, forward-looking title searches for competing leases on the property that might have been filed after the letter of intent. Therefore, when GeoSouthern recorded its lease on December 9, 2010, Orca did not discover it even though the thirty-day period to "re-examine" title work was still running under the letter of intent.

On January 5, 2011, Orca signed six leases, identical except for the property descriptions. Paragraph 18 of the leases signed by the parties contained the "Negation of Warranty" clause quoted above. Paragraph 1 of the leases provided in part:

> 1.    A. <u>Grant of Interest/Description</u>. Lessor, in consideration of a cash bonus in hand paid, of the royalties herein provided, and of the agreements of Lessee hereinafter contained, hereby grants, leases and lets unto Lessee for the sole purpose of exploring for, drilling, operating and producing oil and/or gas . . . the following described land situated in <u>  DeWitt  </u> County, State of <u>  Texas  </u>, (sometimes referred to hereinafter as the "leased premises" or "said lands") . . . .
>
>     B. <u>Exceptions and Reservations</u>. Lessor expressly EXCEPTS from this lease and RESERVES all minerals of every kind and character in, on, and under the lands above described, except only the oil and gas as hereinabove defined . . . .

On January 11, Orca delivered payment of $3,217,585 to JPMorgan pursuant to the leases. Orca contends and offered summary judgment evidence that when its representative delivered the payment, Mettham again represented that the property was "open" in response to Orca's inquiry. Orca recorded its leases on January 12. Some days later, GeoSouthern contacted JPMorgan about the duplication, and JPMorgan attempted to return Orca's consideration. Orca refused the payment, and sued for alleged lost profits of approximately $400 million.

At a pretrial conference, the trial court heard argument on five issues of law that JPMorgan contended were dispositive of Orca's claims. After hearing, the trial court signed a Rule 166 order containing the following conclusions:[3]

---

[3] The trial court's order also included rulings on Orca's tortious interference and civil conspiracy claims. Because Orca states in its brief that it does not pursue these claims in this appeal, we do not consider them further.

1. The Letter of Intent and the six Leases are unambiguous.  As stated therein, the parties agreed that the Leases would be, and were, "without warranties of any kind" and "without recourse in the event of a failure of title."

2. Orca cannot establish the element of justifiable reliance necessary for its claims of fraud, statutory fraud, and negligent misrepresentation.

3. The unambiguous terms of the Letter of Intent and Leases bar Orca's claim for breach of contract.

The trial court then rendered final judgment for JPMorgan.  This appeal followed.

## STANDARD OF REVIEW

Subsection (g) of rule 166, Texas Rules of Civil Procedure, provides that a trial court may direct the parties to appear at a pretrial conference to consider "[t]he identification of legal matters to be decided by the trial court."  TEX. R. CIV. P. 166(g).  The trial court must make an order reciting the actions taken at the pretrial conference, which "control[s] the subsequent course of the action."  TEX. R. CIV. P. 166; *see also In re Estate of Henry*, 250 S.W.3d 518, 526 (Tex. App.—Dallas 2008, no pet.) (discussing trial court's order under rule 166).  After a rule 166 pretrial conference, the trial court identified and determined six matters of law, and rendered judgment for JPMorgan.  We review questions of law de novo.  *See, e.g.*, *Ferry v. Sackett*, 204 S.W.3d 911, 912 (Tex. App.—Dallas 2006, no pet.) (appellate court performs de novo review of pure questions of law).  "A de novo review is less deferential than ordinary reviews because a trial court has no discretion in deciding what the law is or in properly applying it."  *Id.*; *see also McCreight v. City of Cleburne*, 940 S.W.2d 285, 287 (Tex. App.—Waco 1997, writ denied) (concluding that rule 166 order "dispos[ing] of one of [plaintiff's] theories of liability in a summary fashion" was "essentially a partial summary judgment," and applying de novo standard of review).

The standard of review for questions of fact under rule 166 is the same as for a directed verdict.  *Walden v. Affiliated Computer Servs., Inc.*, 97 S.W.3d 303, 324 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).  A directed verdict in favor of a defendant is proper when the

plaintiff does not present evidence that raises a fact issue essential to the plaintiff's right of recovery, or when the plaintiff admits or the evidence conclusively establishes a defense to the plaintiff's cause of action. *Prudential Ins. Co. v. Fin. Review Servs. Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). In reviewing a directed verdict, the standards are the same as a legal sufficiency challenge. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). We must credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *See id.* at 827.

**DISCUSSION**

To decide Orca's three issues, we must interpret the leases to determine (1) whether Orca contractually disclaimed reliance on any representation by JPMorgan, thereby barring its fraud and negligent misrepresentation claims; (2) whether Orca so clearly appreciated the risk of a prior lease that a reasonable factfinder would be compelled to find any reliance unreasonable; and (3) whether, regardless of the viability of its fraud and negligent misrepresentation claims, Orca disclaimed any warranty by JPMorgan, thereby barring its claim for breach of contract. We conclude the provisions of the leases do not bar Orca's fraud and negligent misrepresentation claims, but do bar Orca's contract claims as a matter of law, for the reasons we discuss below.

### 1. Breach of contract claim

In the Rule 166 Order, the trial court determined as a matter of law that "[t]he unambiguous terms of the Letter of Intent and Leases bar Orca's claim for breach of contract." In its third issue, Orca contends this ruling was error. In Count VII of its operative petition, Orca asserts its breach of contract claim. Paragraph 59 of Orca's petition quotes the contractual provision Orca contends was breached by JPMorgan:

> Lessor, in consideration of a cash bonus in hand paid, of the royalties herein provided, and of the agreements of Lessees hereinafter contained, hereby grants, leases, and lets unto lessee for the sole purpose of exploring for, drilling, operating, and producing oil and/or gas . . . from the land leased

–6–

hereunder, the following described land situated in DeWitt County, State of Texas.

In paragraph 60 of its petition, Orca claims that appellees "failed to convey the Property to Orca because they claim they previously leased the property to a third party," and therefore breached the letter of intent and the leases. Orca's breach of contract pleading omits reference to the negation of warranty provision quoted above, included in both the letter of intent and the leases, which states that each lease "is made without warranties of any kind, either express or implied, and without recourse against Lessor in the event of a failure of title."

Orca contends that "[t]he leases cannot reasonably be construed as waiving Orca's right to redress in the event JPMorgan failed to convey the property as promised." Orca argues (1) the phrase "failure of title" in paragraph 18 "cannot reasonably be construed to include prior leases by JPMorgan of the same property it leased to Orca," but if the phrase may be so construed, then it is ambiguous and presents a fact issue for the jury, and (2) even if Orca waived any express warranties, it did not waive the covenants implied under section 5.023 of the Texas Property Code. *See* TEX. PROP. CODE ANN. § 5.023 (West 2014). We disagree with both propositions.

We begin by briefly considering the character of Orca's claim to damages under the lease itself as a function of its nature as both a deed of conveyance and a contract. In Texas, minerals, including oil and gas, are regarded as a part of the fee interest from the inception of the estate. *Brown v. Humble Oil & Refining Co.,* 83 S.W.2d 935, 940 (Tex. 1935).[4] That interest may be severed from the surface estate or at any point in the chain of title by a deed or reservation or, as here, by the execution of an oil and gas lease. Quite unlike the "lease" of a surface interest, a standard oil and gas lease, then, has the effect of transferring a fee interest in land—a fee simple

---

[4] While the surface owner may claim ownership to the minerals in place, prior to severance, in jurisdictions recognizing that interest as title, he does so subject to the law of capture by which his neighbors might remove the minerals by drilling operations on their own property without trespass. *Brown*, 83 S.W.2d at 940.

determinable—for the period of, and subject to the terms of, the lease. The lease thus operates as both a conveyance and a contract. This is hardly unusual, as the transfer of other land interests by deed or lease, i.e., freehold or non-freehold, do the same. In particular, and as relevant here, the standard lease of a dwelling or the sale of the fee interest in land may or may not be accompanied by warranties, expressed or implied, assuring rights of the transferee. And, regardless of the nature or description of the transaction, those warranties may be excluded or waived by the parties. *Gym-N-I Playgrounds v. Snider,* 220 S.W.3d 905, 909–13 (Tex. 2007) (lease); *Young v. Rudd,* 226 S.W.2d 469, 472 (Tex. Civ. App.—Texarkana 1950, writ ref'd n.r.e.) (sale). Thus, a warranty concerning title is not part of the conveyance but is a separate contract, enforceable as such and subject to rules governing contract construction, regardless of the form of the transaction. *Bond v. Bumpass,* 100 S.W.2d 1047, 1049 (Tex. Civ. App.—Dallas 1973), *aff'd,* 131 Tex. 266, 114 S.W.2d 1172 (1938).

We therefore agree with Orca that any claim to relief for a failure to effect a transfer of good right or title to the lessee in contravention of the lease must sound in contract, if at all. *See Rowe v. Heath,* 23 Tex. 614, 619–20 (1859); *Unit Petroleum Co. v. David Pond Well Serv., Inc.*, 439 S.W.3d 389, 395–96 (Tex. App.—Amarillo 2014, pet. denied) (an oil and gas lease in Texas "is a contract and must be interpreted as one.") (quoting *Sabre Oil & Gas Corp. v. Gibson*, 72 S.W.3d 812, 816 (Tex. App.—Eastland 2002, pet. denied)). The question at this stage, of course, is whether any such claim in contract can survive as a matter of law in view of the lease's language.

When interpreting an unambiguous contract, the primary concern of the court is to ascertain the parties' intentions as expressed in the instrument. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). That intent must be taken from the agreement itself, not from the parties' present interpretation, and the agreement must be enforced as it is written. *Calpine Producer*

*Servs., L.P. v. Wiser Oil Co.*, 169 S.W.3d 783, 787 (Tex. App.—Dallas 2005, no pet.). This is known as the "Four Corners Rule," which means that the intention of the parties is to be ascertained from the instrument as a whole and not from isolated parts thereof. *Id.* We consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam). If, after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous and we construe it as a matter of law. *Id.* The courts will enforce an unambiguous instrument as written; and, in the ordinary case, the writing alone will be deemed to express the intention of the parties. *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 728 (Tex. 1981).

Orca focuses on the phrase "failure of title," urging that it unambiguously refers only to "a defect in the chain of title descending to the Red Crest Trust." Under Orca's interpretation, as long as the trust obtained good title when it acquired the property, there would be no "failure of title" even if, after it acquired its title, the trust effected a transfer of its interest by a lease, sale or other disposition. Orca argues the disclaimer "cannot reasonably be interpreted as showing an intent by Orca to waive its right to receive a remedy in the event JPMorgan had already leased the covered acreage to a third party." Read in context, however, the "failure of title" phrase appears in a very broad contractual provision disclaiming "warranties of any kind, either express or implied," and denying "recourse against Lessor in the event of a failure of title." Orca's argument, in effect, is that the disclaimer leaves the lease's contractual covenants to function as a special warranty. Unlike a general warranty deed, which expressly binds the grantor to defend against title defects created by himself and all prior titleholders, the grantor under a special warranty deed is bound to defend the title only against the claims and demands of the grantor and all persons claiming through him. *See Dyer v. Cotton*, 333 S.W.3d 703, 712 n.2 (Tex. App.—

–9–

Houston [1st Dist.] 2010, no pet.) (citing *Munawar v. Cadle Co.*, 2 S.W.3d 12, 16 (Tex. App.—Corpus Christi 1999, pet. denied)). But in light of the broad disclaimer of "warranties of any kind, either express or implied," this argument is not well-taken.

As JPMorgan argues and as briefly outlined above, an oil and gas lease is not a "lease" in the traditional sense in Texas, but instead "conveys title to all of the oil and gas in place to the lessee." *Nat. Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 192 (Tex. 2003). The lessee acquires ownership of all the minerals in place that the lessor owned and purported to lease, subject to the possibility of reverter. *Id.* The parties' use of the term "title" in the disclaimer encompasses the interest that, under the terms of the leases, JPMorgan purported to convey and Orca sought to acquire. And under the express terms of the letter of intent and the leases, Orca is "without recourse" under the lease if title fails. This contractual allocation of risk is not ambiguous. As we have explained, in interpreting an unambiguous contract we consider only the parties' agreement in order to ascertain their intent at the time the agreement was made. *See Calpine Producer Servs., L.P.*, 169 S.W.3d at 787. "[A] court will not change the contract merely because it or one of the parties comes to dislike its provisions or thinks that something else is needed." *Id.* Objectively considering the language chosen by the parties at the time of their agreement, there is no indication that the parties expected JPMorgan would convey a special, but not a general warranty to Orca. Contracting parties are free to structure their contractual undertaking and allocate risk as they see fit. *See El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 811–12 (Tex. 2012). "The role of courts is not to protect parties from their own agreements, but to enforce contracts that parties enter into freely and voluntarily." *Id.* at 810–11. The trial court correctly enforced the parties' agreement as written. *See id.*

In the alternative, Orca argues that even if any express warranty of title has been disclaimed, there was no disclaimer of the statutory implied covenant against prior conveyances. This covenant is set forth in section 5.023(a)(1) of the property code:

> (a) Unless the conveyance expressly provides otherwise, the use of "grant" or "convey" in a conveyance of an estate . . . implies only that the grantor . . . covenant[s] to the grantee . . . :
>
> > (1) that prior to the execution of the conveyance the grantor has not conveyed the estate or any interest in the estate to a person other than the grantee; . . .

TEX. PROP. CODE ANN. § 5.023(a)(1). There is also an implied covenant "that at the time of the execution of the conveyance the estate is free from encumbrances." *Id.* § 5.023(a)(2). Orca argues (1) the waiver of implied warranties in the leases is not specific enough to waive the statutory warranties; and (2) any warranties of title disclaimed in the leases "are separate and distinct from the covenants implied through the Property Code."

Under the property code, "a covenant of warranty is not required in a conveyance." TEX. PROP. CODE ANN. § 5.022(b) (West 2014). If the grantor omits a warranty clause, no warranties will be implied except as to prior conveyances by the grantor and encumbrances. *Bond*, 100 S.W.2d at 1049. But even that implied warranty as to prior conveyances may be disclaimed "if the conveyance expressly provides otherwise." TEX. PROP. CODE ANN. § 5.023(a).

Orca contends the statutory covenant is "separate and distinct from the warranty of title," citing *City of Beaumont v. Moore*, 202 S.W.2d 448, 453 (Tex. 1947). Orca argues that the leases disclaim only "warranties of any kind, either express or implied," and under *Moore*, the statutory "covenant" is not the same thing as a "warranty."[5] The court in *Moore* explained that the

---

[5] Orca also cites *Luker v. Arnold*, 843 S.W.2d 108, 115 (Tex. App.—Fort Worth 1992, no writ), *overruled in part by PPG Indus., Inc. v. J.M.B./Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 82 n.1, 92 (Tex. 2004), for the proposition that the statutory implied covenant "has nothing to do with implied warranties, which are different creatures." Neither *Luker* nor the case upon which it relies, however, addressed implied covenants dealing with conveyances of property. *See id.* (proposed warranty of developers to develop property in good and workmanlike manner for consumers who ultimately buy property from separate builder); *Humber v. Morton*, 426 S.W.2d 554, 555–56 (Tex. 1968) (contractor's implied warranty that house was constructed in good and workmanlike manner and was suitable for human habitation). The court in

statutory implied covenant against encumbrances "is intended to protect the grantee against rights or interests in third persons, which, while consistent with the fee being in the grantor, diminish the value of the estate conveyed." *Id.* Thus, the *Moore* court's statement that the implied statutory covenant was "separate and distinct from the warranty of title" was in explanation that even where the grantor owns the property (that is, holds "the fee"), the grantor may be called upon to indemnify the grantee if an interest in a third party, such as a lienholder, decreases the value of the property conveyed. *See id.* But the court also explained that "the covenant against incumbrances is embraced within the general warranty clause . . . ." *Id.* "The covenantor warrants that he will restore the purchase price to the grantee if the land is entirely lost," or restore a portion of the consideration in cases of partial loss. *Id.*

Orca also cites *Gibson v. Turner*, 294 S.W.2d 781, 787 (Tex. 1956), in support of its argument that warranties of title, even if disclaimed in the leases, are different from the implied statutory covenants in section 5.023(a). In *Gibson*, the court explained that a warranty of title "does not constitute part of the conveyance." 294 S.W.2d at 787. The covenant of general warranty in a lease "warrants the title of the lessees," not the lessors. *Id.*; *see also McMahon v. Christmann*, 303 S.W.2d 341, 347 (Tex. 1957) ("The purpose and operative effect of the [warranty of title] covenant is not to guarantee that the lessor has good title to the premises but to guarantee the lessee in his title thereto."). As we explained in *Davis v. Andrews*, 361 S.W.2d 419, 424–25 (Tex. Civ. App.—Dallas 1962, writ ref'd n.r.e.), "[t]he very purpose of the warranty covenant is for the indemnity of the purchaser against a loss or injury he may sustain by a defect in the vendor's title. The warranty clause does not convey title nor does it determine the character of the title conveyed."

---

*Humber* explained that the predecessor to property code section 5.023 "relates to covenants of title which arise out of conveyances and not to collateral covenants such as the suitability of a house for human habitation." *Id.* at 556.

But the implied covenant on which Orca relies is a promise that the grantor has not conveyed the property interest to anyone else. *See* TEX. PROP. CODE ANN. § 5.023(a)(1). As noted, this covenant is included in the "covenant of general warranty" and is the essence of the special warranty, both of which were emphatically excluded from this lease. *Compton v. Trico Oil Co.*, 120 S.W.2d 534, 537 (Tex. Civ. App.—Dallas 1938, writ ref'd) ("a deed with covenant of general warranty means that the grantor has not conveyed the same estate, or any right, title, or interest therein, to any person other than the grantee, and that the property is free from encumbrances" (internal citations omitted)). And Orca expressly disclaimed "warranties of *any kind, whether express or implied*." While the clause did not directly and specifically reference the possibility of a prior lease to GeoSouthern or to anyone, its far-reaching breadth to any warranty of any kind is sufficient. Therefore regardless of Orca's arguments that the covenant regarding prior conveyances is different from "warranty of title" or implied by statute, Orca's disclaimer encompassed its claim and foreclosed it. We overrule Orca's third issue.

## 2. Fraud and negligent misrepresentation

In its first two issues, Orca contends the trial court erred by ruling that the negation of warranty barred Orca's claims for fraudulent inducement and negligent misrepresentation by disproving the element of reliance as a matter of law. We agree.

### a. Contractual waivers of reliance

For purposes of this appeal, JPMorgan assumes that Mettham represented to representatives of Orca that the properties in question were "open" for lease. JPMorgan contends, however, that Orca's claim for this misrepresentation is barred by the disclaimer in the leases. While a contract may generally be voided for fraud, under certain circumstances, the parties' agreement in the contract with respect to whether either is relying on prior representations of the other may be treated as a separate undertaking, severable from the balance

–13–

of the agreement and enforced in much the same way as an arbitration commitment would be. *E.g., Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 446 (2006); *In re Labatt Food Serv.,* 279 S.W.3d 640, 647–48 (Tex. 2012). Thus, under appropriate circumstances,[6] a disclaimer of reliance embedded within a contract said to be induced by fraud will continue to function as an estoppel foreclosing what might otherwise appear to be a colorable claim of fraudulent inducement. *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997).

JPMorgan urges that the waiver of warranty language had the effect of disclaiming the reliance element necessary to maintain a fraud or misrepresentation claim under *Schlumberger* and its progeny. But the "intent to disclaim reliance on others' representations—that is, to rely only on one's own judgment" must be "evident from the language of the contract itself." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 335 (Tex. 2011) (citing *Schlumberger*, 959 S.W.2d at 180, and *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 54 (Tex. 2008)). "Pure merger clauses, without an expressed clear and unequivocal intent to disclaim reliance or waive claims for fraudulent inducement, have never had the effect of precluding claims for fraudulent inducement." *Id.* at 334. The clause at issue, "[t]his lease is made without warranties of any kind, either express or implied, and without recourse against Lessor in the event of a failure of title," does not mention the word reliance or purport to disclaim any earlier statements or representations of JPMorgan. In *Italian Cowboy*, the restaurant lease at issue included a clause entitled "representations," and a clause entitled "entire agreement." *See id.* at 328. The former clause was the tenant's acknowledgment that the landlord had not made any

---

[6] In order to give effect to such a disclaimer, the Texas Supreme Court has, among other things, required clear and unequivocal language of that intent in order to protect parties from unintentionally waiving a claim for fraud. It has also been mindful of the contractual context. A settlement agreement between sophisticated parties already embroiled in controversy and represented by counsel, as in *Schlumberger Technology Corp. v. Swanson*, 959 S.W.3d 171, 180–81 (Tex. 1997)*,* would appear to be the quintessential setting for an effective disclaimer. An agreement initiating a long-term lease relationship, on the other hand, "should be all the more clear and unequivocal in effectively disclaiming reliance." *Italian Cowboy Partners v. Prudential Ins. Co. of Am.,* 341 S.W.3d 323, 335 (Tex. 2011).

representations about the premises "except as expressly set forth herein." *Id.* The latter clause provided that the lease constituted the entire agreement of the parties. *Id.* The court held neither of these clauses was sufficient to disclaim reliance on the lessor's statements, made before the parties signed the lease, that the building to be leased "was in perfect condition." *See id.* at 328, 336. In fact, the previous tenant had moved out after unsuccessful attempts to remedy a persistent sewer gas odor on the premises, and the lessor was aware of the problem. *Id.* at 329, 338. The court concluded, "[w]e have repeatedly held that to disclaim reliance, parties must use clear and unequivocal language," contrasting the provisions in *Schlumberger* and *Forest Oil* which stated the contracting party was not "relying upon any statement or representation" in executing the contract. *Id.* at 336. There is no such unequivocal language in the negation of warranty paragraph relied on by JPMorgan. We conclude the negation of warranties is not sufficient to meet the standards of *Italian Cowboy*.

### b. Direct conflict between representation and contract

JPMorgan contends, however, that "this case is not about a generic merger clause," so that *Italian Cowboy* does not apply. Rather, JPMorgan urges that Orca's fraud in the inducement claim, premised on Mettham's alleged assurances that the property remained open for lease, must fail here in the face of Mettham's insertion of the disclaimer of warranty into the agreement. Thus, according to JPMorgan this case "is about whether reliance is justified in light of a specifically negotiated, 'red flag' provision conflicting with the alleged misrepresentations." In support of this argument, JPMorgan cites *Miller Global Properties, LLC v. Marriott International, Inc.*, 418 S.W.3d 342, 348 (Tex. App.—Dallas 2013, pet. denied), and *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010). In both cases, justifiable reliance was disproved as a matter of law. *See Miller*, 418 S.W.3d at 348–50; *Grant Thornton, LLP*, 314 S.W.3d at 923.

–15–

To be sure, "[a] party cannot justifiably rely on oral representations in an arms-length transaction that are directly contradicted by the contract he signs." *McGonagle v. Stewart Title Guar. Co.*, 432 S.W.3d 535, 541 (Tex. App.—Dallas 2014, pet. denied) (citing *Miller*, 418 S.W.3d at 347–48). In *Miller*, we noted that the subject matter of the alleged misrepresentations was "specifically dealt with at significant length in the contracts between the parties" and was "directly contradicted by the contracts' terms." *Miller*, 418 S.W.3d at 348. We distinguished *Italian Cowboy*, explaining that "the contract at issue in *Italian Cowboy* did not address the subject matter made the focus of the dispute and nothing in the agreement contradicted the alleged misrepresentation." *Id.* at 350. We concluded, "[w]hen a party signs a contract that directly contradicts alleged misrepresentations and affirmatively disclaims any promises or representations other than those made in the contract, the party cannot justifiably rely on alleged extra-contractual misrepresentations as a matter of law." *Id.*

Neither *Italian Cowboy* nor *Miller* is exactly on point. In *Italian Cowboy*, the contractual disclaimers did not address the subject of the misrepresentation. *Italian Cowboy*, 341 S.W.3d at 328, 336. In *Miller*, the contract dealt with the subject of the misrepresentations "at significant length." *Miller*, 418 S.W.3d at 348. Here, the negation of warranty provision does address the subject of failure of title, but does not disclaim reliance on statements made by JPMorgan or directly conflict with Mettham's statements that the properties were open. *See also Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 424 (Tex. 2015) (per curiam) (no justifiable reliance as matter of law where plaintiff chose not to read release before signing it and instead relied on defendant's representation that document was a receipt, but on its face "intent and effect" of release was "obvious and unambiguous").

In *Grant Thornton LLP*, the court concluded that investors did not justifiably rely on an accountant's audit report when buying additional bonds where the investors' own sophisticated

senior portfolio manager knew the company issuing the bonds had lost its primary source of funding. *Grant Thornton LLP*, 314 S.W.3d at 923–24. The court stated that "both fraud and negligent misrepresentation require that the plaintiff show actual and justifiable reliance," and explained, "[i]n measuring justifiability, we must inquire whether, given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud, it is extremely unlikely that there is actual reliance on the plaintiff's part." *Id.* (quoting *Haralson v. E. F. Hutton Group, Inc.*, 919 F.2d 1014, 1026 (5th Cir. 1990), *abrogated on other grounds by Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) (internal quotation marks omitted)). The court continued, "[m]oreover, a person may not justifiably rely on a representation if there are 'red flags' indicating such reliance is unwarranted." *Id.* (quoting *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546–47 (5th Cir. 2003) (internal quotation marks omitted)). The court rendered judgment for the accountant, concluding there was no evidence of justifiable reliance by the investors on the accountant's statement that the issuer was in compliance with certain escrow requirements. *Id.* at 931.

Relying on *Grant Thornton LLP*, JPMorgan claims that several "red flags" preclude justifiable reliance by Orca as a matter of law. JPMorgan cites Mettham's statement that he "would have to check" whether the property was open for lease; JPMorgan's insistence on the stricter negation of warranty provision; JPMorgan's refusal to accept responsibility for verifying title; the letter of intent itself; Mettham's statement that other lessees were not doing careful title work; Orca's knowledge that competitors might delay recording their leases; Orca's knowledge that it did not check property records after the letter of intent was signed; and Orca's landman's "doubts" when delivering the bonus check, asking Mettham to confirm whether the property was open. But as Orca points out, these purported red flags are questions of fact for a jury regarding whether Orca's reliance on Mettham's representations that the property was open to lease was

reasonable, not, as in *Grant Thornton LLP*, evidence making actual reliance "extremely unlikely." *See id.* at 923–24. Orca offered evidence that Mettham's statements were consistent with Orca's own title work, and therefore Orca did not undertake any new title searches after the letter of intent was signed. Whether this reliance was reasonable under the circumstances is a fact question to be resolved by a jury. *See, e.g., Bank of Texas, N.A. v. Glenny*, 405 S.W.3d 310, 318 (Tex. App.—Dallas 2013, no pet.) (summary judgment improper where genuine issues of material fact existed about whether Bank justifiably relied on letters and other information in loan application).

As noted above, the breadth of the warranty waiver is substantial and sufficient to defeat any contract claim arising from any defect in title. But that same breadth of reach undermines JPMorgan's claim of a "direct" conflict between Mettham's alleged statements assuring that the property was still open for lease and the lease language. Our cases rejecting misrepresentation claims based on a conflict with subsequent contract language have consistently required a "direct" conflict with the earlier representation such that a reasonable person could not read the agreement and still plausibly claim to believe the earlier representation. *E.g., Miller*, 418 S.W.3d at 348 (alleged statements that property development was "essentially complete" and existing budget adequate were in conflict with contract's 21 pages listing 200 projects yet to be approved and provision assigning risk of cost overruns to plaintiff); *Simpson v. Woodbridge Props., L.L.C.*, 153 S.W.3d 682, 684 (Tex. App.—Dallas 2004, no pet.) (alleged representation that seller was not concerned with deadlines conflicted with contract's imposing a specific deadline for closing).

We are aware of no case from this Court (or any other for that matter) that would treat a general disclaimer of warranty as so plainly correcting an earlier, specific misrepresentation to the effect that the seller of a land interest himself had not already, recently sold the same interest to someone else as to warrant a rendition of judgment. The far-sweeping warranty disclaimer

–18–

here would have covered a virtually limitless span of title defects on numerous tracts ranging from misplaced boundary fences to pretermitted heirs, and certainly did so without making any reference to a prior lease. In all events, we do not believe the disclaimer of warranty here was sufficiently specific to re-assign that risk from a seller, with obviously superior knowledge of its own actions, to a buyer who is groping for the same information in the face of what a reasonable jury might find as an assurance from the seller that he had not already sold the property to someone else.

We conclude that questions of fact remain regarding Orca's claim that it was fraudulently induced into a contractual relationship with JPMorgan. The same questions of fact remain regarding Orca's negligent misrepresentation claims, which also require proof of justifiable reliance. *See Grant Thornton LLP*, 314 S.W.3d at 923. JPMorgan contends that in the letter of intent and the leases, Orca expressly assumed the responsibility to ensure that the properties were available to be leased. Even if that is the case, JPMorgan was not free to affirmatively misrepresent that the properties were open in order to induce Orca into a contractual relationship, as Orca claims it did. A jury may decide that no misrepresentations were made, or that Orca did not reasonably rely on them. But as a matter of law and based on the record presently before us, Orca has offered more than a scintilla of evidence to support its claim that it was fraudulently induced into a contractual relationship with JPMorgan and suffered damage as a result. We sustain Orca's first and second issues.

## CONCLUSION

We reverse the trial court's judgment as to Orca's fraud and negligent misrepresentation claims, affirm the judgment as to Orca's claim for breach of contract, and remand the cause to the trial court for further proceedings consistent with this opinion.

/David J. Schenck/
DAVID J. SCHENCK
JUSTICE

131700F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

ORCA ASSETS, G.P., L.L.C., Appellant

No. 05-13-01700-CV          V.

JPMORGAN CHASE BANK, N.A.,
JPMORGAN CHASE BANK, N.A.,
TRUSTEE OF THE RED CREST TRUST,
AND PHILIP METTHAM, Appellees

On Appeal from the 44th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-12-05303.
Opinion delivered by Justice Schenck,
Justices Bridges and Lang participating.

        In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** that portion of the trial court's judgment on the claims of Orca Assets, G.P., L.L.C., for fraud and negligent misrepresentation. In all other respects, the trial court's judgment is **AFFIRMED**. We **REMAND** this cause to the trial court for further proceedings consistent with this opinion.

        It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 11th day of August, 2015.